**SACK & SACK, ESQS.**
Jonathan S. Sack, Esq.
110 East 59th Street, 19th Floor
New York, New York 10022
Tel.: (212) 702-9000
*Attorneys for Plaintiff, Marino Marin*

UNTIED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- x

MARINO MARIN,

07 CV 10377

Civ. No. _____ (___)

Plaintiff,                        ECF CASE

— against —

**LANE BERRY & CO. INTERNATIONAL, LLC,** and        **COMPLAINT**
**FREDRICK C. LANE**

Defendants.                  JURY TRIAL REQUESTED

--------------------------------------------------------------------- x

Plaintiff, MARINO MARIN ("*Marin*" or "*Plaintiff*") by his attorneys, Sack &

Sack, Esqs., as and for its complaint, alleges as follows:



## NATURE OF ACTION

1.      This action is brought by Marin against his former employer, Defendants Lane Berry International & Co., LLC ("*Lane Berry*") and Lane Berry's Chairman and Chief Executive Officer, Fredrick C. Lane, ("*Mr. Lane*", together with Lane Berry, the "*Defendants*").

2.      The claims made herein are based upon Lane Berry's termination of Plaintiff's employment and in connection with Lane Berry's unlawful denial of terms, conditions and privileges of Plaintiff's employment.

3.      The claims made herein are based upon Lane Berry's breach of the express terms and conditions of Plaintiff's contract for compensation in respect of his employment and continued employment.

4.      Alternatively, the claims made herein are based upon Lane Berry's express promises for certain terms, conditions and privileges concerning his employment and termination from employment, which sums are unconditionally due him.

5.      Furthermore, the claims made herein are based upon Lane Berry's intentional actions to defraud Plaintiff out of monies, rights and privileges by making express promises that Lane Berry never intended to honor.

6.      Although duly demanded both orally and in writing, Lane Berry has failed and/or continues to refuse to pay to Plaintiff the sums of money unconditionally due him for earned bonuses, which amounts equal no less than $2,000,000 as further described herein.

7.      Lane Berry owes to Plaintiff the equivalent sum of money, which the

Plaintiff would have received "but for" Lane Berry's breach of its promises concerning Plaintiff's employment and termination from employment and fraudulent acts, which sums Lane Berry has secreted, retained and kept for its own benefit and use.

8.     The amounts that were and would be earned by Plaintiff represent wages, bonuses, benefits, wage supplements, and compensation bargained for, earned and belonging to Plaintiff.

9.     Furthermore, the claims made herein are based upon Lane Berry's unlawful discrimination against Plaintiff in the terms, conditions and privileges of his employment in violation of the New York State Human Rights Law, Executive Law §290 et seq. ("*NYSHRL*") and the Administrative Code of the City of New York §8-101 et seq. ("*NYCHRL*") based upon his national origin, Italian.

10.     Plaintiff alleges that the discriminatory conduct and behavior engaged in by Lane Berry was perpetuated mainly by its Chairman and Chief Executive Officer, Mr. Lane.

11.     At all times relevant herein, Plaintiff was an employee within the meaning of the NYSHRL and NYCHRL, which protects against unlawful discrimination by Lane Berry against Plaintiff based upon his national origin, Italian.

12.     At all times relevant herein, Lane Berry was an employer within the meaning of the NYSHRL and the NYCHRL.

13.     At all relevant times herein, Mr. Lane was Plaintiff's supervisor, and in a position to discriminate against Plaintiff in violation of NYSHRL and NYCHRL.

14.     At all relevant times herein, Mr. Lane is an individual who either aids,

abets, incites, compels or coerces unlawful discrimination pursuant to NYSHRL and NYCHRL.

15.     This is also an action grounded in New York's Labor Law arising from Lane Berry's unlawful deductions from Plaintiff's earned wages.

16.     New York Labor Law § 193 (McKinney's Cons Laws of New York, Book 30) ("NYS Labor Law") provides:  "no employer shall make any deduction from the wages of an employee" and "no employer shall make any charge against wages, or require an employee to make any payment by separate transaction."

17.     In respect of Lane Berry's violation of New York's Labor Law and breach of contract, Plaintiff seeks damages in the amount of at least $2,000,000 plus statutory liquidated damages, attorney's fees and costs.

18.     By the filing of this Complaint, Plaintiff seeks adjudication and judgment on the merits of his lawful entitlement to those monetary sums due him.

19.     The amounts that were and would be earned by Plaintiff represent wages, bonuses, benefits, wage supplements, and compensation bargained for, earned and belonging to Plaintiff.

## THE PARTIES

20.     Plaintiff is a natural person who currently resides at 78 Riverside Lane, Riverside, CT  06878 in the County of Fairfield.

21.     At all relevant times, Defendant Lane Berry maintained, and Plaintiff was employed at, offices located at 600 Madison Avenue, 14th Floor, New York, New York 10021 in the County of New York.

22.     At all relevant times, Defendant Fred Lane was employed at Lane Berry's offices located at 100 Federal Street, 33rd Floor, Boston, Massachusetts 02110, County of Suffolk.

## JURISDICTION, VENUE AND CHOICE OF LAW

23.     This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(a).  The parties are of diverse citizenship and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

24.     Venue is appropriate in this district under 28 U.S.C. § 1391(a).  The acts which give rise to this Complaint took place in this District and the Agreement(s) in question were arose (and were breached by Defendant) in this District.

## FACTS COMMON TO ALL COUNTS[1]

### PLAINTIFF'S EDUCATIONAL AND EMPLOYMENT HISTORY

25.     Plaintiff is a very well respected banker in the sector of mergers and acquisitions ("M&A") who, immediately prior to his employment with Lane Berry, ranked consistently for 5 years as one of the top 10 M&A bankers in Europe and among the top 32 bankers in the world.  (See, e.g., Exs. A and B.)

26.     Plaintiff's place in the coveted top 10 M&A bankers in Europe is based upon the volume of deals generated by Plaintiff and his group.

27.     From November 2001 through April 2005, prior to his employment with Lane Berry, Plaintiff worked for UniCredit Banca Mobiliare the investment banking subsidiary of Unicredito Italiano spa ("Unicredit"), the largest Italian Bank by market

---

1. All directly quoted statements, unless otherwise specified, are the sum and substance of such statements as recalled by Plaintiff.

capitalization.

28.    At Unicredit, Plaintiff headed, established and built the M&A Group to over $70 billion in business through deals with over 50 mandates.

29.    At Unicredit, Plaintiff had a team of 10 – 12 employees reporting to him.

30.    In respect of his last year of employment at Unicredit, Plaintiff earned over $1.3 million in total compensation ($220,000 base salary, approximately $140,000 in housing allowance and approximately $800,000 in bonus).

31.    Plaintiff is married to his wife, Leila Horn, for 8 years.  Together, Plaintiff and Leila have 3 children: Vittorio (7), Jacopo (4), and Angelica (2).

32.    In 1992 Plaintiff graduated from Bocconi University in Milan, Italy with a 3.9 GPA.  Plaintiff is also a Chartered Accountant.

### PLAINTIFF IS RECRUITED BY LANE BERRY

33.    In or about early 2005, for both personal and professional reasons, Plaintiff sought to move to the United States.

34.    In furtherance of his desire to become employed in the United States, Plaintiff contacted the executive search firm, Bialecki Inc. and its principal, Linda Bialecki, to discuss his professional intentions.

35.    In or about April 2005, Ms. Bialecki suggested that Plaintiff meet with Fred Lane, the CEO and Chairman of Lane Berry.

36.    In or about April 2005, Plaintiff first met with Fred Lane, Lane Berry's Chairman and CEO, in New York.

6

37.     Though Plaintiff was originally impressed by Mr. Lane, Plaintiff decided not to pursue the opportunity to join Lane Berry at that time given the small size of the firm (at that time the revenues were $6 million for Fiscal Year 2004) and its limited track record.

38.     During the period from April 2005 through August 2005, Plaintiff continued to accept invitations of recruitment from various financial institutions on Wall Street, including a serious offer from Cantor Fitzgerald, LLC ("*Cantor*"). (Ex. C.)

39.     On August 2, 2005, Ms. Bialecki contacted Plaintiff at the request of Fred Lane to invite Plaintiff to Boston to once again discuss the possibility of joining Lane Berry. (Ex. D.) Plaintiff accepted Mr. Lane's invitation.

40.     On or about August 25, 2006, Plaintiff, together with his wife, stayed in Boston (originally they were invited to stay at Mr. Lane's home) where they met with Mr. Lane and his wife, Wendy, over the course of 2 days (2 dinner meetings and a full day at the Lane home).

41.     On or about August 25-26, 2005, during their meetings, Mr. Lane expressed increased interest in recruiting Plaintiff to join Lane Berry.

42.     At that time, Plaintiff informed Mr. Lane that he currently was considering serious competing offers including, but not limited to a serious offer from Cantor.

43.     In response to Plaintiff's competing offer, and in an attempt to induce Plaintiff to forego the Cantor offer and accept employment with Lane Berry, Mr. Lane represented the following promises to Plaintiff upon which Plaintiff relied, to his detriment:

(i)   "If you join Lane Berry, you will be employed as a Managing Director and will run our M&A Group."

(ii)  "In the Managing Director position as Head of our M&A Group, based upon your abilities to build and grown firms and their M&A Groups, you will be considered part of the growth engine of the firm, and handsomely compensated for your role as such."

(iii) "On all deals that you close, you will be paid approximately 40% of revenues generated in respect of such deal."

(iv)  "We launched a private equity fund called Mainspring that will provide you and other Lane Berry bankers, through access to equity participation and leverage, additional long term wealth."

(v)   "During your first twelve (12) months as Managing Director, as per Lane Berry's business model, you will not be required to be productive in order to receive a bonus for that first year. It is basically a grace period." (See, also, Ex. K, p. 39).

(vi)  "I would be shocked if you do not make at least $1 mm the first year." (See, also, Ex. I – Visa application)

(vii) "The firm is a collegial, family oriented environment." (See, e.g., Ex. E.)

44.   Following Mr. Lane's promises and representations, Plaintiff left the meeting with a growing interest to forego the other offers and accept employment with Lane Berry.

45.   On or about September 16, 2005, Plaintiff was invited back, at Lane Berry's expense, for additional meetings in both their New York and Boston offices. (Ex.

F.)

46.     On or about September 22 – 23, 2005, at that round of interviews in New York and Boston, Mr. Lane offered Plaintiff a position as a Partner and Managing Director at Lane Berry to build and grow Lane Berry's M&A Group.

47.     On September 29, 2005, Lane Berry provided Plaintiff with an offer letter that contained a schedule illustrating how bonuses are to be paid and their applicable percentage within Lane Berry (the "*Lane Berry Bonus System*"). (Ex. G)

**DEFENDANT PREPARES FOR PLAINTIFF'S ARRIVAL**

48.     From September 30, 2005 through April 3, 2006, Plaintiff prepared for his arrival to Lane Berry by finalizing the terms and conditions of his employment, constantly providing Lane Berry with guidance and advice for the M&A Business and preparing Lane Berry for the arrival of Plaintiff's pipeline business. (See, e.g., Ex. H.)

49.     On November 16, 2005, Fred Lane wrote to Paul Novak, Director at the Citizenship and Immigration Services, where he represented (and confirmed) that: **"We have hired Mr. Marin into the Managing Director position at an annual base salary of $185,000 with panoply of benefits and with expectation that his remuneration will *easily* be One Million Dollars or more annually.    His sterling reputation, record of extraordinary achievements, and Lane Berry's expectations render such remuneration a given."** (Exhibit I.)

50.     On December 22, 2005, Plaintiff, for example, shared with Lane Berry a

9

pipeline of business that Plaintiff was prepared to bring to Lane Berry. (Ex. J.)

51.     Nearly every week from September 30, 2005 through his arrival on April 3, 2006, employees at Lane Berry called or wrote to Plaintiff seeking advice and guidance concerning the M&A business.

52.     During that time as well, Plaintiff negotiated with Lane Berry's CFO, Karen Vernamonti, for an increase in Plaintiff's starting base salary to $200,000 at the same level as all other Managing Directors in the Firm.

53.     In addition, on or about February 16, 2006, Ms. Vernamonti discussed with Plaintiff the possibility of him investing in Lane Berry. Following their discussions, Lane Berry provided Plaintiff with a copy of its investment prospectus or "PPM."

54.     In the PPM, Plaintiff received written confirmation (on page 39 of the PPM) of the prior verbal promises and representations Mr. Lane made to Plaintiff.

55.     Specifically, the PPM provides that during the first year of employment Lane Berry bankers are paid **"as market requires us to compensate new investment bankers with bonus awards during their first year of employment as if they were productive during this period, even if they are not."** (Ex. K, p. 39.)

56.     The PPM further states, **"We will, in essence, "carry" these professionals during their grace period. . ."**

57.     The PPM also indicated that in respect of 2005, Lane Berry revenues were approximately $12 million.

58.    On or around March 13, 2006, following his review of (and based upon the promises and representations contained in) the PPM, Plaintiff agreed to commit to investing $125,000 in Lane Berry.[2]

59.    At that time, on or about March 13, 2006, Plaintiff also agreed to commence his employment with Lane Berry on April 2, 2006. (Ex. L.)

60.    On or about March 31, 2006, in reasonable reliance upon the promises and representations made to Plaintiff by Lane Berry (including those written promises and representations set forth in the PPM concerning banker compensation), Plaintiff separated from Unicredit, which resulted in his receiving a reduction in his bonus of approximately $400,000 in respect of his excellent performance on behalf of Unicredit in 2005.

61.    Following his resignation and in preparation for the commencement of his employment with Lane Berry in New York, Plaintiff moved himself and his family from Milan, Italy to Riverside, Connecticut.

## PLAINTIFF COMMENCES EMPLOYMENT WITH LANE BERRY

62.    On or about April 3, 2006, based upon the promises and representations made to Plaintiff by Lane Berry (and Fred Lane), Plaintiff commenced his employment with Lane Berry as a Partner, Managing Director and Head of Lane Berry's M&A Group.

63.    Immediately upon the commencement of his employment, to Plaintiff's

---

2 Plaintiff did not actually transfer funds in respect of his $125,000 investment commitment until June 30, 2006.

surprise and disappointment, Plaintiff was approached by the Head of Lane Berry's New York Office, and informed that he will not be the Head of Lane Berry's M&A Group, despite representations made by Fred Lane to the contrary.

64.    Specifically, the Head of Lane Berry's New York Office told Plaintiff, **"Marino, there's been a change. Despite what you have been told, you're not going to be heading our M&A Group. Instead, now that you're here, we'd like you to concentrate on an industry vertical limited to industrial and consumer products rather than a broad spectrum of industries."**

65.    Having already resigned from Unicredit and forgoing offers from competing firms, Plaintiff had no alternative but to accept the reduced duties unilaterally imposed upon him by Lane Berry.

66.    At that time, the Head of Lane Berry's New York Office assured Plaintiff, **"Don't worry Marino. I know this is a bit of a surprise, but we assure you that this will have no effect on your compensation and you will be well paid for choosing Lane Berry."**

67.    Despite his shock and disappointment, in reasonable reliance upon the promises and representations made to him by the Head of Lane Berry's New York Office and Mr. Lane, Plaintiff remained at Lane Berry as a loyal and dedicated employee interested in performing his duties to his fullest potential and acting in furtherance of the best interests of the firm.

68.    As requested by Lane Berry, Plaintiff successfully obtained his series 7 and series 63 licenses.

## PLAINTIFF BRINGS THE RAIN

69.    From the immediate commencement of his employment on April 3, 2006, Plaintiff endeavored to generate significant revenues on behalf of Lane Berry using his contacts, experience and acumen to tap resources and engage mandates for the firm in furtherance of its business.

70.    Oftentimes, Lane Berry did not accept Plaintiff's mandates though those mandates would have generated significant revenues.

71.    Plaintiff was second-guessed about a number of potential engagements. For example, with respect to the Prada shoe business and another real estate ventures in Europe, Plaintiff was told by his superiors to refer those mandates elsewhere.

72.    Despite tying his hands, Plaintiff continued to persevere and obtained several signed engagement letters ("mandates") with clients that Plaintiff himself attracted to Lane Berry using his contacts, expertise and acumen.

73.    By the end of 2006, Plaintiff had a current total book of business of over $8 million and committed retainers that exceeded $500,000.

74.  Within months of the commencement of his employment with Lane Berry, Plaintiff generated the following mandates solely as a result of his expertise and relationship with clients:

| # | DATE | PROJECT | TYPE | CLIENT | RETAINER COMMITTED[3] | RETAINER INVOICED | SUCCESS FEES (MM) | CLOSING |
|---|------|---------|------|--------|----------|----------|----------|---------|
| 1 | Apr-06 | Harbor[4] | Sell side | Selling Shareholders | $120,000 | $120,000 | $1.3 | Q1 2007 |
| 2 | Jun-06 | Bushnell[5] | Buy side | TSG Consumer | $0 | $0 | $2.0 | dead |
| 3 | Jul-06 | HFH[6] | Sell side | Rhone Capital | $8,000 | $8,000 | $0.6 | dead |
| 4 | Aug-06 | AIS[7] | Sell side | Selling Shareholders | $80,000 | $80,000 | $1.2 | Q3 2007 |
| 5 | Sep-06 | TSG[8,9] | Buy side | TSG Consumer | $0 | $0 | $0.8 | Q2 2007 |
| 6 | Nov-06 | TSG[10,11] | Buy side | TSG Consumer | $0 | $0 | $2.0 | Q3 2007 |
| 7 | Nov-06 | Wollars[12] | Sell side | Selling Shareholders | $150,000 | $75,000 | $1.5 | Q3 2007 |
| 8 | Nov-06 | Superga[13] | Buy side | K Swiss | $25,000 | $0 | $0.7 | Q2 2007 |
| 9 | Dec-06 | Tesmec[14,15] | Finder fee | Sterling square | $0 | $0 | $1.0 | Q2 2007 |
| 10 | Dec-06 | TSG[16,17,18] | Retainer | TSG Consumer | $50,000 | $0 | $0.0 | Q2 2007 |
| | | | | Total | $583,000 | $233,000 | $11.1 | |

| | |
|---|---|
| Total Pipeline | $11.10 |
| dead deals | $2.60 |
| net current pipeline | $8.50 |

3 These numbers are applicable during Plaintiff's tenure with Defendant
4 original pipeline of Plaintiff
5 new client generated by Plaintiff
6 original pipeline of Plaintiff
7 new client generated by Plaintiff and the transaction was closed in 2007, with Defendant monetizing $1.1 million.
8 new client generated by Plaintiff
9 the client wanted to hire Defendant as a result of Plaintiff's relationship with Target Company(ies)
10 5 targets at 2% success fees High potential
11 the client wanted to hire Defendant as a result of Plaintiff's relationship with Target Company(ies)
12 client reached out to Plaintiff while at Defendant. Plaintiff won engagement from Morgan Stanley. The transaction was closed in 2007 and Defendant monetized $220,000.
13 the client wanted to hire Defendant as a result of Plaintiff's relationship with Target Company(ies)
14 the client wanted to hire Defendant as a result of Plaintiff's relationship with Target Company(ies)
15 Client is linked to Plaintiff's presence at Defendant
16 the client wanted to hire Defendant as a result of Plaintiff's relationship with Target Company(ies)
17 Client is linked to Plaintiff's presence at Defendant
18 Provides for equity incentive as high as 10% of the total profit of the Client when a sale of a target will occur

75.   In addition to the mandates he generated, Plaintiff supported Lane Berry in the approval and was actively involved in the successful sale of Etonic by Lane Berry to Lotto Spa, an Italian company.  The engagement generated revenues of $750,000.

76.   On many occasions Plaintiff utilized his personal contacts and reputation to attract equity capital to Lane Berry.  For example, Plaintiff reached out to a number of domestic and international investors such as Istithmar, Mediobanca, San Paolo, Cantor Fitzgerald, Arner Bank and others to supply capital to Lane Berry in order to grow its M&A business.

77.   During the first several months of his employment, Plaintiff delivered on all the promises he made regarding building an M&A Group and utilizing his skills, expertise, acumen and contacts to generate revenues and domestic and international business leads to grow the M&A Group at Lane Berry.

78.   On October 18, 2006, Plaintiff presented a project to Fred Lane regarding his build up plan of the industry vertical he was put in charge of by the Head of Lane Berry's New York Office; specifically Lane Berry's Industrial and Consumer vertical. (Ex. M.)

79.   On October 19, 2006, as testament to Plaintiff's efforts, Mr. Lane responded to Plaintiff's presentation by email clearly stating that Plaintiff's **"contributions are recognized"** and that Plaintiff should **"continue to be the creative rainmaker he is."** (Ex. N.)

**PLAINTIFF RECEIVES A PALTRY BONUS**

80.   On or about December 15, 2006, Mr. Lane informed Plaintiff that his 2006 bonus as a Partner and Managing Director would be a paltry $100,000 without any stock grants. Mr. Lane told Plaintiff that the bonus is on the **"low side because the CFO was not doing her job"** and that **"the burn rate of the firm is $1.3 million per month."**

81.   Plaintiff was extremely disappointed that despite the promises and representations made by Lane Berry and the significant revenues attributable to Plaintiff's generation of business and mandates, Lane Berry provided Plaintiff with a bonus way below market, what Plaintiff was paid in prior years, and what was promised if Plaintiff would indeed agree to join Lane Berry.

82.   Pursuant to the promises made to Plaintiff (i.e., that Defendant would "compensate new investment bankers with bonus awards during their first year of employment as if they were productive during this period, even if they are not") and based on market rates, revenue generated by Plaintiff (well in excess of not being "productive"), and pipeline of current deals under execution, Plaintiff was entitled to receive at least $1 million in total compensation.

83.   Upon seeing Plaintiff's disappointment, shock and disbelief, Mr. Lane asked Plaintiff to **"erase the conversation and also not to discuss the amount with his wife",** and that he will talk to him again over the weekend. Mr.

Lane confirmed to Plaintiff that he is **"on his side"** and that **"he will work out something."** (Ex. O.)

84.     In addition, in the same email, Mr. Lane unilaterally modified the promises and representations he made to Plaintiff in his September 29, 2005 email disclosing yet new percentages of fees for Managing Directors pursuant to the Lane Berry Bonus System.

85.     Despite Mr. Lane's further promises that **"he will work out something"** and despite prior promises and representations concerning the incentive compensation Plaintiff would receive in accordance with the Lane Berry Bonus System, upon which Plaintiff relied to his detriment, Plaintiff's 2006 Bonus of $100,000 remained unchanged.

86.     On or about December 19, 2005, upon realizing that Lane Berry breached its agreements with Plaintiff concerning the terms, conditions and privileges of his employment, and given Plaintiff's family expenses related to the recent move to the US, Plaintiff requested from Mr. Lane that Lane Berry repurchase Plaintiff's $125,000 investment in Lane Berry, to which Mr. Lane agreed to do.

87.     On or about January 18, 2007, Plaintiff was repaid his investment.

88.     On December 28, 2006, in yet another act of bad faith, Plaintiff was provided with only $75,000 of the promised $100,000 bonus.

89.     On or about December 28, 2006, following Plaintiff's complaints, Mr. Lane relented and provided Plaintiff with the outstanding bonus payment of $25,000.

(Ex. P.)

90.    In the beginning of January 2007, in a veiled effort to appease Plaintiff's disappointment over his meager 2006 Bonus, Mr. Lane promised to Plaintiff and other managing Directors in the firm that they will soon receive a plan of action that will set forth parameters for receiving additional bonus monies in respect of 2006 as well as additional equity distributions.

91.    During this time, despite the paltry 2006 Bonus, Plaintiff continued to generate revenues, revenue opportunities and introduce investors to Mr. Lane.

92.    Furthermore, Defendant never provided Plaintiff with stock grants that were promised as part of Plaintiff's compensation. (see Ex. G).

93.    By February 16, 2007, after not receiving any information concerning an additional 2006 bonus or equity distribution, Plaintiff contacted Mr. Lane to follow-up on what is later learned to be another empty promise.

94.    At that time, Plaintiff informed Mr. Lane that the empty promises and the reneging of the original terms of Plaintiff's employment has created an "intolerable situation."

95.    In response, Mr. Lane once again promised Plaintiff **"to work this out"** and both Mr. Lane and Plaintiff agreed to meet on February 21, 2007 to resolve these issues.

96.    Immediately following his conversation, Plaintiff contacted the Head of Lane Berry's New York Office and recounted his conversation with Mr. Lane.  Plaintiff

confirmed to the Head of Lane Berry's New York Office that he does not want to leave Lane Berry and wants to work out his differences with Mr. Lane on February 21, 2007 as planned.

### PLAINTIFF SUFFERS DISCRIMINATION AND IS TERMINATED

97.    On February 16, 2007, without notice, justification or cause, Lane Berry terminated Plaintiff's email account, thereby surreptitiously cutting off Plaintiff's contact with his clients and business contacts.

98.    On February 19, 2007, Mr. Lane wrote to Plaintiff on his personal e-mail account, stating that there is a **"need to talk about how to satisfy our obligations to clients where there are engagement letters."** (Ex. Q.)

99.    On that same day, February 19, 2007, Plaintiff asked Mr. Lane why he terminated Plaintiff's employment.   In response, Mr. Lane explained that because Plaintiff removed some of his personal reading material from his office he assumed that Plaintiff had resigned.

100.    Plaintiff confirmed to Mr. Lane that he never resigned.   At that time, Mr. Lane cancelled their previously scheduled February 21, 2007 meeting.

101.    On Tuesday, February 20, 2007, Mr. Lane announced in a firm wide address that Plaintiff **"no longer works at Lane Berry."**

102.    Mr. Lane further added that Plaintiff is a **"cultural misfit"** and refers to Plaintiff's country of origin in a discriminatory fashion.

103.   Despite Mr. Lane's prior cancellation of their February 21, 2007 meeting, Plaintiff went to Mr. Lane's New York office to **"work out the situation."**

104.   On February 21, 2007, Plaintiff and Mr. Lane met twice.   The first meeting took place at 10:00 am and the second meeting took place at 12:30 pm.

105.   At the 10 a.m. meeting, Mr. Lane confirmed that Plaintiff was terminated and asked Plaintiff **"where are you going to work following Lane Berry."**

106.   Plaintiff was shocked by Mr. Lane's comments considering Plaintiff was under the impression that the two of them were going to work out their differences and that Plaintiff would continue as an employee of Lane Berry.

107.   At the 12:30 p.m. meeting, in a last effort to work out their differences, Mr. Lane admitted and acknowledged that Plaintiff **"was not paid fairly"** and **"according to the expectations"** and promises that were made to Plaintiff to induce him to accept employment with Lane Berry.

108.   In addition, at the 12:30 p.m. Meeting, Mr. Lane admitted that he announced Plaintiff's departure from Lane Berry prematurely.  Mr. Lane further admitted that he should have used better judgment than to call Plaintiff a **"cultural misfit"** and make disparaging remarks about Plaintiff's ethnic origins.

### POST TERMINATION

109.   Consequently, on or about February 21, 2007, without reason, notice, justification or cause, Plaintiff was terminated from his employment with Lane Berry.

110. Despite prior agreements, promises and representations, and verbal and written demands by Plaintiff, Lane Berry failed to properly compensate Plaintiff in accordance with the agreed upon terms and conditions of his employment.

111. At all times, Plaintiff was ready, willing and able to fulfill his obligations to Lane Berry.

112. Plaintiff never exhibited any disloyalty to Lane Berry or its goals while performing the duties of his employment. In fact, Plaintiff attracted investors / clients to Defendant in order to further support its growth.

113. There was no legitimate business justification for Lane Berry to make discriminatory remarks concerning Plaintiff's national origin.

114. As a testament to Plaintiff's abilities, acumen and professional relationships, a portion of the above clients followed Plaintiff subsequent his departure from Defendant, despite aggressive tactics from Mr. Lane to personally retain these clients (e.g., Stirling Square (see Ex. R), Marina Genova and Wollars). Most clients rebuffed Mr. Lane's retention efforts, but in the case of Wollars, the client had to pay a termination fee that was later deducted from Plaintiff's fees at closing in the amount of $220,000.

115. As further testament to the above, Plaintiff received several emails from regretful clients that remained with Lane Berry.

116. For example, around the closing of the AIS deal, Plaintiff received emails that stated as follows: **"LB [Defendant] got the deal of the bet of both of us. You landed the deal and pulled the wagon"** and **"You were the reason**

**that we ultimately retained Lane Berry to provide us with Investment Banking services.    Those services were retained at a premium to another firm that candidly we felt was every bit as qualified.    We thought when we stacked up the standard PRO and CON chart you were the clear difference maker and were excited to hire Lane Berry because we got you"**. and **"You were invaluable in the process"** (see Ex. L).

117.    Other clients were confused by Plaintiff's departure and referred their business to other competitors.

118.    On the contrary, Plaintiff consistently exuded a strong sense of dedication to Lane Berry without any incidence of poor performance or disciplinary action.

119.    At the time of his termination, Plaintiff significantly implemented, developed, built and maintained Defendant's investment banking business, improved overall financial performance, increased Defendant's profits and generated in a few months at least $8.6 million in business as a direct consequence of his hard work, savvy business acumen, expert analytical skills and in-depth knowledge of Defendant's investment banking business.

120.    Plaintiff also leveraged his reputation and reached out to domestic and international investors to supply capital to Defendant in order to grow its business.

121.    Finally, as of the date of this Complaint, two things are notable: (i) Defendant does not employ any staff in New York City; and (ii) all Lane Berry Managing Directors resigned within a short time period following Plaintiff's termination.

122.    As a result of his termination, Plaintiff is owed at least $2,000,000 in respect of earned but unpaid portions of his 2006 Bonus (the "*Accrued Obligations*").

## CLAIMS AND DAMAGES

Based upon the above allegations, Plaintiff maintains the following legal claims against Defendants:

## COUNT ONE
### (Breach of Contract)

123.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

124.    As of the date of this Complaint, Defendant remains in material breach of contract in respect of Plaintiff's Accrued Obligations, as more fully described herein.

125.    Despite verbal and written demands, Plaintiff was not paid any portion of the earned Accrued Obligations duly owed to him.

126.    Plaintiff was not paid any portion of the Accrued Obligations, which is unprecedented by Defendant's policies, practices and procedures, despite a combination of:

   a.   the parties' written agreements;

   b.   the parties' prior and prospective conduct and course of dealings and payment to other similarly situated employees; and

   c.   numerous express verbal promises and representations made to and reasonably relied upon by Plaintiff by those agents of Defendant in authority during the course of Plaintiff's employment with Defendant.

127.    Plaintiff is unquestionably qualified to receive the Accrued Obligations promised to him, under the express conditions previously agreed to between Plaintiff and Defendant.

128.    Accordingly, Plaintiff is owed and entitled to receive an amount of $2,000,000 in respect of his Accrued Obligations.

## COUNT TWO
### (Breach of Implied Contract)

129.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

130.    Even without an express written or oral agreement specifying the exact terms of Plaintiff's compensation, there exists an implied contract to pay the amounts previously delineated herein and otherwise due and owing to Plaintiff.

131.    Accordingly, based upon the prior conduct and "course of dealing" between Plaintiff and Defendant as well as Defendant's practices of paying Plaintiff and similarly situated agents or employees certain compensation, an implied contract exists in respect of the compensation, of which Plaintiff was paid zero.

132.    Plaintiff has been caused thereby to suffer damages in amount of not less than $2,000,000, in respect of his Accrued Obligations.

## COUNT THREE
### (Quantum Meruit – Unjust Enrichment)

133.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

134.    Defendant promised to pay Plaintiff certain compensation for the work, labor and services provided with respect to his employment, which is usual and customary as and for the reasonable value of services rendered and to-be-rendered for the foreseeable future.

135.    Plaintiff performed the services required to perform services with the full expectation of receiving the compensation promised to him that is described hereunder, which what was reasonable, fair and customary, as compared with what was paid to similarly situated employees performing substantially the same work in which Plaintiff was engaged.

136.    Plaintiff fully performed all of his obligations and "but for" the unlawful termination, would have continued to perform all of his obligations for the foreseeable future.

137.    Defendant failed and refused to pay to Plaintiff compensation which was fair and customary.

138.    Defendant's conduct with respect to Plaintiff is actionable as a breach of contract based upon Quantum Meruit under New York's quasi contract law.

139.    Plaintiff has been caused thereby to suffer damages in amount of not less than $2,000,000.

## COUNT FOUR
### (Promissory Estoppel)

140.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

141.     Plaintiff is entitled, under the doctrine of *promissory estoppel*, to compensation for the work, labor and services provided to Defendant in respect of his employment, which relationship would have continued for the foreseeable future.

142.     Defendant, through its agents, made a clear and unambiguous promise to Plaintiff, upon his agreement to remain employed with Defendant, that Plaintiff would be unconditionally paid his Accrued Obligations.

143.     In reasonable reliance upon the numerous unequivocal and express verbal promises, representations and guarantees made to and relied upon by Plaintiff to his detriment by those agents of Defendant in authority during the course of Plaintiff's employment, Plaintiff continued to remain employed with Defendant through the date of his termination.

144.     Defendant made certain unequivocal and express verbal promises, representations and guarantees to and relied upon by Plaintiff to his detriment in order to induce him to remain with Defendant.

145.     Such reliance by Plaintiff was reasonably foreseeable at the time Defendant and its agents made these promises.

146.     Courts have found that if there comes a time when a party makes an unambiguous promise to another and that party reasonably and forseeably relies upon that

promise, it is unconscionable to allow that party nothing.

147.    Accordingly, Plaintiff reasonably relied to his detriment on the above-mentioned promises and representations made by Defendant.

148.    Plaintiff has been injured by reason of his reliance on the foregoing representations and promises of Defendant, in the amount equal to at least the value of his Accrued Obligations of $2,000,000.

## COUNT FIVE
### (Labor Law)

149.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

150.    Defendant herein is an "employer," as that term is defined in the applicable NYS Labor Law.

151.    At all material times herein, Plaintiff was an "employee," as that term is defined in the applicable NYS Labor Law.

152.    New York Labor Law § 193 (McKinney's Cons Laws of New York, Book 30) provides: *"no employer shall make any deduction from the wages of an employee"* and *"no employer shall make any charge against wages, or require an employee to make any payment by separate transaction."*

153.    Defendant has unlawfully made deductions from Plaintiff's earned compensation.

154.    Defendant is therefore liable to Plaintiff under Labor Law § 193 and

Plaintiff is entitled to costs, together with reasonable attorney's fees.

155.    In addition, Defendant's violation of § 193 was willful.

156.    Accordingly, Defendant, in addition to its liability for costs and attorney's fees as aforesaid, are liable under Labor Law § 193 and for statutory penalties equal to 25% of all applicable wages.

## COUNT SIX
### (National Origin Discrimination)

157.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

158.    Defendant's discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's national origin, Italian.

159.    Similarly situated non-Italian co-workers are treated to a lower standard of performance than that of Plaintiff, an Italian.

160.    Defendant engaged in this pattern of harassment, mistreatment and retaliation in bad faith and in a manner that was different than the treatment of non-Italian employees. Defendant and its agent have not applied the same grounds for termination to non-Italian employees.

161.    The aforementioned acts of Defendant constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of his employment because of his national origin in violation of the provisions of the New York State Human Rights Law, Executive Law §290 et seq. and the Administrative Code of the City of New York §8-101

et seq., causing Plaintiff to suffer humiliation, loss of income, and other damages.

162.     As a result of the foregoing, Plaintiff has and will continue to suffer irreparable and significant damage to his personal and professional reputation, humiliation, loss of income, and other damages.

163.     As a result of the foregoing, Plaintiff is entitled to recover from Defendant an amount equal to the value of all compensation to be earned by Plaintiff had his employment not been interfered with, including all to be earned salary and bonuses, stock options, benefit payments, profit sharing, through the end of the term of the Employment Agreement, as well as costs, attorney's fees and prejudgment interest at no less than 9%.

164.     As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $2,000,000.00 in compensatory damages from the Defendant in addition to all other amounts sought herein.

165.     In committing the acts alleged herein, Defendant acted with intent, oppression, gross negligence, malice, wanton disregard for the rights of Plaintiff, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $2,000,000.00 to adequately punish Defendant and to deter Defendant from continuing and repeating such conduct in the future.

## COUNT SEVEN
### (against Lane)

166.     Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

167.     As a result of the aforementioned actions, Defendant Lane has

discriminated against plaintiff on account of his National Origin with respect to the terms, conditions and privileges of his employment in violation of New York Executive Law § 290 et seq.

168.    As a result of the aforementioned actions, Lane has violated the New York Executive Law §290 et seq. by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

169.    As a result of Lane's discrimination (and aiding, abetting and inciting discrimination) against him, plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, inconvenience, damage to reputation and career, mental anguish and humiliation.

## ATTORNEY'S FEES AND COSTS

170.    Attorney's fees and costs are warranted in this matter as the undersigned, on behalf of Plaintiff have in good faith, attempted to negotiate a reasonable resolution with Defendant without having to refer this matter to this forum for adjudication, determination and final resolution on the merits.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Honorable Court order the following relief in favor of Plaintiff:

I.      On Count One, an amount of not less than $2,000,000 plus interest and costs;

II.     On Count Two, an amount of not less than $2,000,000 plus interest and

costs;

III.    On Count Three, an amount of not less than $2,000,000 plus interest and costs;

IV.    On Count Four, an amount of not less than $2,000,000 plus interest and costs;

V.    On Count Five, grant Plaintiff damages pursuant to applicable NYS Labor Law, plus liquidated damages because of Defendant's willful violation of NYS Labor Law, plus interest and costs;

VI.    On Count Six, an amount of not less than $2,000,000 plus interest and costs;

VII.    On Count Seven, an amount of not less than $2,000,000 plus interest and costs;

VIII.    An award of prejudgment interest, costs, punitive damages (where applicable) and attorney's fees; and

IX.    Such other and further relief that this Honorable Court may deem just and proper.

Dated: New York, New York
       November 12, 2007

                                Respectfully submitted,

                                **SACK & SACK, ESQS.**

By: _____
    Jonathan S. Sack, Esq.

*Attorneys for Plaintiff*
110 East 59th Street, 19th Floor
New York, New York 10022
Tel.: (212) 702-9000
Fax: (212) 702-9702

**EXHIBIT A**



**mergermarket**

The Mergermarket Group
**Deal Drivers – Ireland**    The Berkeley

Home    Intelligence    Dealscope    Deals    League Tables    Profiles

House:  New Search – Last Search    Individual:  New Search – Last Search

## Individual League Table: Results

Sort by [Deal Value – largest ▾]

| Rank | Advisor | Current Level | Current House | Value (US |
|------|---------|---------------|---------------|-----------|
| 1 | Woody Young | Level1 | Lehman Brothers | |
| 2 | Paul Parker | Level1 | Lehman Brothers | 130 |
| 3 | Philippe le Bourgeois | Level1 | Rothschild | 114 |
| 4 | Michael Zaoui | Level1 | Morgan Stanley | 113 |
| 5 | Yoel Zaoui | Level1 | Goldman Sachs | 109 |
| 6 | Thierry Varene | Level1 | BNP Paribas SA | 96 |
| 7 | Marc Pandraud | Level1 | Merrill Lynch | 97 |
| 8 | Pierpaolo Cristofano | Level1 | UBS (formerly UBS Warburg) | 93 |
| 9 | Patrick Ponsolle | Level1 | Morgan Stanley | 90 |
| 10 | Bradley Whitman | Level1 | Lehman Brothers | 80 |
| 11 | Roger Altman | Level1 | Evercore Partners Inc | 84 |
| 12 | Felix Rohatyn | Level1 | Rohatyn Associates LLC | 84 |
| 13 | Michael Price | Level1 | Evercore Partners Inc | 83 |
| 14 | Richard Girling | Level1 | Merrill Lynch | 83 |
| 15 | Olivier Pecoux | Level1 | Rothschild | 83 |
| 16 | Jean-Francois Biard | Level1 | BNP Paribas SA | 80 |
| 17 | Jack Levy | Level1 | Goldman Sachs | 76 |
| 18 | Thierry Pauchad | Level1 | BNP Paribas SA | 74 |
| 19 | Lee OBrien | Level1 | UBS (formerly UBS Warburg) | 73 |
| 20 | Adrian Mee | Level1 | Morgan Stanley | 74 |
| 21 | Pedro Pasquin | Level1 | Lazard | 73 |
| 22 | Rick Leaman | Level1 | UBS (formerly UBS Warburg) | 72 |
| 23 | Jeronimo Braggiotti | Level1 | Lazard | 71 |
| 24 | Ga Liu | Level1 | Rohatyn Associates LLC | |
| 25 | Arnaldo Borghese | Level1 | Lazard | 68 |
| 26 | George Bindic | Level1 | Lazard | 68 |
| 27 | Gary Parr | Level1 | Lazard | 65 |
| 28 | Damian Troell | Level1 | Lazard | 65 |
| 29 | Gerry Cravetti | Level1 | UBS (formerly UBS Warburg) | 61 |
| 30 | Alex Zoghi | Level1 | Lazard | 57 |
| 31 | Francesco Sanchez Asiain | Level1 | UBS (formerly UBS Warburg) | 57 |
| 32 | Nicholas Mockett | Level1 | UniCredit Banca Mobiliare (UBM) | 52 |
| 33 | Morgan Conte | Level1 | Merrill Lynch | 52 |
| 34 | Luca Penna | Level1 | Goldman Sachs | 49 |
| 35 | Erid Medow | Level1 | Citigroup Inc | 52 |
| 36 | Frank Healy | Level1 | Citigroup Inc | 50 |
| 37 | Marc Union | Level1 | UBS (formerly UBS Warburg) | 50 |

| 38 | Marco Samaja | Level 1 | Lazard | |
|----|--------------|---------|--------------|----|
| 39 | Federico Imbert | Level 1 | JPMorgan | 57 |
| 40 | Alberto Nagel | Level 1 | Mediobanca SpA | 5 |
| | | | | 56 |

**You Searched on the following Criteria:**

| | |
|---|---|
| Advisors | Financial advisor |
| Advising who? | Either |
| Ranking | Unique table to be ranked by value |
| Individual Position | Level 1 |
| Date From | 01/01/2002 |
| Date To | 12/31/2005 |
| Match Seller Geography | No |
| Currency | USD |

Copyright © 2006 mergermarket Limited, all rights reserved, about us | Contact us | Feedback | Privacy Policy | Terms & Conditions | Disclaimer

**EXHIBIT B**

A CAUTIONARY TALE OF AN UNSCRUPULOUS WINE TRADER PAGE 23
HOW KRISPY KREME WENT STALE PAGE 12
NOVARTIS/ CIRCUIT CITY, THE VIKINGS AND METROMEDIA PAGE 16



# Deal

VOICE OF THE NEW ECONOMY · FEBRUARY 28–MARCH 6 2005

## INVESTCORP'S NEW GAME

# CONTENTS

FEBRUARY 28—MARCH 6 2005 THE DEAL

## NEWS & THE WEEK IN REVIEW
MCI stands by Verizon
Novartis becomes a genetics giant
View from the City: Dutch treat
Permira cashes in on Premiere debut
Ebro Puleva buys Panzani
Medco pays $2.2B to acquire Accredo
Greenhill effect: JMP plans IPO
Apax and Saunders Karp join forces
FTC weighs risk in video challenge

## THE CORPORATION
Corporate dealmakers:
How Krispy Kreme went stale
Industry insight: The rules
Tech confidential:
HP and Apple—coming or going?



## ADVISERS
### WALL STREET
Deal diary: Goldman gets a good dose
from Novartis, Circuit City brings in
the big guns, faulty bio hurts purple
pride and Metromedia seeks
a higher price
Follow the money: Does Hudson City's
conversion lead to the acquisition trail?
Movers & shakers
Auction block
### BANKRUPTCY
Letter from Delaware
DIP dimensions: Panda Gila River LP
Feature: A cautionary tale
of an unscrupulous wine trader
Calendar



...LLC.
VP Interactive Publisher: Stephen Goldberg
VP Subscription Sales: Michael Conrad
VP Corporate Affairs: Helene Gentsch
VP Operations: Alan Rubel
VP Finance: Rob Cumberbatch

Headquarters
105 Madison Avenue
New York, NY 10016
212-313-9200
212-313-9250

San Francisco: 415-293-3209
Washington, DC: 202-429-2961
London: 011-44-20-7004-7610

COVER ILLUSTRATION BY PETER MITCHELL

The Deal (ISSN 1541-9878) is published weekly (except the weeks of July 3, 7/4, 7/18, 8/22, 8/29, 11/28, 12/26) for $249 per year by The Deal LLC, 105 Madison Ave, New York, N.Y. and additional mailing offices. POSTMASTER: Send address changes to The Deal, P.O. Box 3502, Northbrook, IL 60065. The Deal is a BPA audited publication.



## INVESTING
### PRIVATE CAPITAL
26  Capital calls: Quadrangle gets personal,
    UBS stumps up $250M, Sun Capital goes
    shopping and Oz funds go public
27  Feature: Investcorp's new game
34  Arbitrage

## SPECIAL REPORT
## HEDGE FUNDS
30  A seat at the table: With board
    representation comes the hard part
31  Omni Energy takes its investors to court
31  S.E.C.: Long lockups may be a red flag
32  A new regulatory era dawns
32  PIPE deals ride a 2004 roller coaster
33  Judgment call:
    A guide to adviser registration

## SCOREBOARD
35  Debtor-in-possession loan metrics
36  Weekly recaps of U.S. and non-U.S.
    M&A, accountants on U.S. deals
37  M&A multiples for the media,
    telecom and manufacturing sectors
38  Technology dealmaking, M&A league
    tables, premiums and breakup fees

## COMMENTARY
39  Media maneuvers:
    Night of the living deal
40  Backstory: Costanza logic
41  Safe harbor: A perception problem?
42  Rules of the road: Divide and conquer
43  Postmortem: BB&T-First Virginia
46  Deal sense
44  Company index

# Editor's letter

**In the secret history** of finance, the desire to escape cyclicality takes up a lot of pages. It's a recurrent fantasy that can suck in everyone from the most naive to the most sophisticated. In the late '80s, bankers as savvy as Citicorp's John Reed, latter-day savior of the New York Stock Exchange, famously offered the notion that economic cycles no longer meant as much as they had in the past—just before Citi almost submerged beneath a down cycle of bad loans. In the '90s, of course, the end of cyclicality was a truism of that disaster of the people, the Internet bubble. And declarations of the end of cyclicality don't just occur in good times: There are always gloomsters willing to take the straight edge and declare that bad is going to get worse before it ends up truly dreadful, like the hockey stick beloved of climatologists.

All this is well known. But we are reminded again, not least by our Media Maneuvers column last week on press chatter about a merger wave, how commonplace linear thinking is in a cyclical world. In fact, the practice of extrapolating from "current" trends—current can mean just about anything—is deeply intuitive, while thinking about cycles causes dizziness. We reflexively think in straight lines. There's a seductiveness to that clean, elegant, straight line motoring to infinity. Deep belief in technology, in human ingenuity, only deepens the impression that forces that twist that straight line into a cycle can be tamed.

At the heart of every cycle lurks the belief that trends are ruled by Newtonian inertia; the media tends to embody that blithe confidence, which is why it has trouble calling turns. There is no quantum physics of deal cycles (as there is no "science" of stock picking, unless you believe the technical crowd or the nearest stock promoter), because each cycle unfolds differently. Nonetheless, there are a few generalities we can offer up. First, stock prices and deal volumes are roughly correlated. In other words, you're not getting a merger boom with legs without support from the stock market, particularly with compensation tied to share prices. The willingness to take risk—higher prices, larger premiums, more debt, less due diligence, more talk of transformation—grows as the cycle ages, again in concert with underlying markets. And just as in the equity markets, deal cycles take on themes. Sectors, like financial or strategic buyers, or large cap and middle market, kick in only when key environmental factors align themselves—from leveraged markets to initial public offerings to regulation to equity and debt markets. Each factor must master its own uncertainties left over from the last down market. And each factor has its own life cycle, from skepticism to confidence to hubris to stark, raving fear, spinning like the cogs of a fancy watch.

Given the time value of money and the daily churn of the markets, nothing in the deal economy stays the same for long. True, it sometimes feels as if deal markets are treading water, but beneath the surface time's arrow is moving forward, change—people, equipment, technology, markets—continues inexorably, and the pressure to move money escalates. We don't know why markets, like the weather, are cyclical, just as you can't tell me why God made the earth round. And we can't predict the future with any degree of accuracy. All that we can know is that the cycles will turn, and what we know today, in all our linear earnestness won't be of much use tomorrow. ■

— Robert Teitelman
Editor in chief

# SCOREBOARD

## M&A ANALYSIS

### M&A LEAGUE TABLES

**Top acquirers of U.S. M&A targets** | *Top 10, ranked by total value of completed deals*

Feb. 18, 2005

| Adviser | No. of deals | Deal value ($bil.) |
|---|---|---|
| | 6 | \$16.6 |
| , Sachs & Co. | 8 | 65.2 |
| & Co. | 5 | 4.4 |
| | 1 | 3.5 |
| Chase & Co. | 4 | 2.3 |
| Brothers Inc. | 2 | 1.9 |
| Financial LLC | 3 | 1.5 |
| Lynch & Co. | 2 | 1.5 |
| | 6 | 1.5 |
| | 5 | 1.4 |

*Includes deals where the acquirer may be from outside the U.S. Excludes withdrawn deals*

Source: Dialogic

**Lawyers on European deals** | *Top advisers based on value of announced deals*

Ended Feb. 18, 2005

| | Investment bank | No. of deals | Volume ($bil.) |
|---|---|---|---|
| Borghesi | Lazard | 9 | \$31.7 |
| Braggiotti | Lazard | 5 | 30.4 |
| Naget | Mediobanca SpA | 2 | 30.4 |
| Simoni | Lazard | 7 | 29.8 |
| Battistella | Lazard | 2 | 29.7 |
| Borrelli | Lazard | 4 | 28.3 |
| Peluso | Mediocredito Centrale | 2 | 28.3 |
| Tirelli | Lazard | 2 | 28.5 |
| F. Monconi | Lazard | 4 | 28.3 |
| Calabria | Lazard | 2 | 27.8 |
| , M. Pappone, M.Tenini | Credit Suisse First Boston | 1 | 27.8 |
| F. R. Ferrini, F. Imbert | Goldman, Sachs & Co. | 1 | 27.8 |
| , A. Rambelli, G. Tognoli, M. Zekkes | J.P. Morgan Chase & Co. | 1 | 27.8 |
| | Mediocredito Centrale | 1 | 27.8 |
| Rabecchini | Mediobanca SpA | 1 | 27.8 |
| F. Re, M. Tamagno | Merrill Lynch & Co. | 1 | 27.8 |
| Marin | UniCredit Banca Mobiliare | 1 | 27.8 |

| | Law firm | No. of deals | Volume ($bil.) |
|---|---|---|---|
| | Sullivan & Cromwell LLP | 7 | \$48.7 |
| Tedeschini | Chiomenti Studio Legale | 3 | 29.7 |
| Bianini | Gianni, Origoni, Grippo & Partners | 2 | 27.9 |
| M. Danusso, S. Gillespie | Allen & Overy LLP | 1 | 27.8 |
| E. Giordano, F. Modulo | Chiomenti Studio Legale | 1 | 27.8 |
| Croxatto | Clifford Chance | 1 | 27.8 |
| J. Rinaldi | Davis Polk & Wardwell | 1 | 27.8 |
| , A. Ciampani | | | |
| Di Celso, A. Segris | Gianni, Origoni, Grippo & Partners | 1 | 27.8 |
| | Studio legale Gatti-Paveri-Verzoni | 1 | 27.8 |
| | Skadden, Arps, Slate, Meagher & Flom LLP | 3 | 26.6 |
| | Clifford Chance | 3 | 22.7 |
| , N. Gosnaont | Linklaters | 2 | 22.6 |
| M. Russell | Shearman & Sterling LLP | 2 | 17.2 |
| | Drivey Ballantine | 1 | 15.1 |
| Burchard | Skadden, Arps, Slate, Meagher & Flom LLP | 5 | 13.2 |

Source: Mergermarket.com, London

## Tech dealmaking | *Key transactions in the speech technology sector*

| Target | Acquirer | Date/deal value | Commentary |
|---|---|---|---|
| Phonetic Systems Inc. | ScanSoft Inc. | 11/15/04 \$35 million in cash plus potential \$35 million earnout | We believe this acquisition, part of several moves by ScanSoft to beef up its speech applications capabilities, will serve as the cornerstone of an directory assistance applications. |
| PipeBeach AB | Hewlett-Packard Co. | 7/23/03 Not disclosed | HP's objective in this deal was to leverage PipeBeach's VoiceXML technologies to establish itself as a global provider of interactive voice solutions. |
| Telera Corp. | Genesys Telecommunications Laboratories Inc. (Alcatel) | 5/29/03 \$278 million in stock | The privately held company gave Alcatel's subsidiary Genesys Telecommunications Laboratories Inc. wider access to the Internet and a useful product to sell to its computer telephony integration installed base. |
| SpeechWorks International Inc. | ScanSoft Inc. | 4/24/03 \$132 million in stock | The deal only partially consolidated the speech recognition market, but it brought ScanSoft a fatly needed \$40 million in cash from the SpeechWorks book. |
| Lernout & Hauspie Speech Products NV (speech processing assets) | ScanSoft Inc. | 11/28/01 \$39.5 million in stock, cash and notes | The asset purchase marked ScanSoft's foray into speech technology and was the first in a series of moves that would make the most active acquirer in the sector. |

Source: Gartner Group, New York

## M&A breakup fees | *Top 10 deals based on the land termination fees*

Nine months rolling, through Feb. 18, 2005

| Target | Acquirer | Deal date | Merger date | Termination fee ($mil.) |
|---|---|---|---|---|
| Veritas Software Corp. | Symantec Corp. | 10/16/04 | \$13,525.1 | \$440.0 |
| Public Service Enterprise Group Inc. | Exelon Corp. | 12/20/04 | 16,199.7 | 400.0 |
| Sears, Roebuck and Co. | Kmart Holding Corp. | 11/17/04 | 16,598.3 | 400.0 |
| MCI Inc. | Verizon Communications Inc. | 2/14/05 | 9,284.6 | 200.0 |
| Caesars Entertainment Inc. | Harrah's Entertainment Inc. | 7/15/04 | 9,386.3 | 160.0 |
| Mandalay Resort Group | MGM Mirage Inc. | 6/4/04 | 7,682.0 | 160.0 |
| Rouse Co. | General Growth Properties Inc. | 8/20/04 | 12,440.0 | 155.0 |
| Banknorth Group Inc. (51% stake) | TD Bank Financial Group | 8/26/04 | 3,690.3 | 150.0 |
| Metro-Goldwyn-Mayer Inc. | Sony Corp. | 9/23/04 | 4,719.0 | 135.0 |
| International Steel Group Inc. | Mittal Steel Co. | 10/25/04 | 4,304.6 | 130.0 |

Source: Dealogic

## M&A premiums | *Top five takeover premiums in the healthcare and construction/building products industries*

Thirty-nine months rolling, through Feb. 18, 2005

| Target | Acquirer | Close date | Deal status | Transaction value ($mil.) | Deal price premium over stock price, one week before |
|---|---|---|---|---|---|
| International Corp. | Pharma Services Co. | 10/14/02 | Completed | 13,489.3 | 79.2% |
| Inc. | Omnicare Inc. | 9/04/04 | Pending | 1,269.2 | 67.8 |
| Care Inc. | Nuevolux Santa Care Inc. | 6/29/04 | Completed | 512.0 | 66.4 |
| ions Inc. | Smith & Nephew plc | 7/13/02 | Completed | 291.4 | 62.3 |
| care Co. | UniPlant Hospitals Inc. | 7/18/04 | Pending | 420.1 | 62.3 |
| **CONSTRUCTION / BUILDING PRODUCTS** | | | | | |
| Communities Inc. | Beazer Homes USA Inc. | 1/30/02 | Completed | 760.0 | 51.6% |
| International Inc. | Mohawk Industries Inc. | 11/19/01 | Completed | 3,725.0 | 43.7 |
| & Farming Co. | Keith & Co. Management Group | 4/18/02 | Completed | 1,052.1 | 23.0 |
| Inc. | Louisa Corp., LNR Property Corp. | 7/21/02 | Completed | 502.2 | 20.8 |
| Inc. | Berkshire Hathaway Inc. | 1/21/02 | Completed | 1,790.2 | 8.94 |

Source: Dealogic

**Bankruptcy** Fear and liquidation
optical communications *page 27*

**The corporation** Whole Foods
tames Wild Oats *page 12*

**M&A** Inside the NBC,
Vivendi Universal deal *page 4*

# The

**VOICE OF THE DEAL ECONOMY**

VOL. 1 NO. 45 MONDAY OCTOBER 13 2003

# The
# telecom
# trinity

Carl Icahn, Wilbur Ross and Warren Buffett
may have designs on rolling up the troubled
telecom industry, but they face plenty of
competition *page 42*

Service 1-888-667-3325 or customerservice@thedeal.com

# CONTENTS



MONDAY, OCTOBER 13, 2003  THE DEAL

## NEWS & THE WEEK IN REVIEW

4  NBC Universal makes its debut
4  Permira raises a record fund
4  GE goes steep for Amersham
5  Mesa Air puts regional rival in play
6  Simon walks away from Taubman mall
6  Hellman snags Axel Springer stake
7  Wall Street starts hiring again
8  Motorola unveils its next move
8  New rules target accounting firms
9  View from the City: Oily politics
10  S&N comes to a crossroads
11  RBS buys in Ireland, Switzerland

## THE CORPORATION

12  Corporate dealmakers:
   Whole Foods tames Wild Oats
15  Industry insight: Believe the hype
16  Executive suite: IHOP's Julia Stewart
16  Silicon Valley special:
   NPTest's tangled history
18  Tech confidential: Enormous changes
   at Lastminute.com, Juniper and Cisco

## ADVISERS

WALL STREET
20  Fortunes & follies
20  Deal diary: No slot for Debevoise
   in Hancock deal, Cleary lawyer's
   French connection, the return
   of earnouts and Evcion's nuke play
24  Movers & shakers
24  Auction block
BANKRUPTCY
26  Letter from Delaware
26  DIP dimensions
27  Feature: Optical delusions
28  Calendar
THE LAW
40  Judgment call:
   Deducting a parent's loan

## INVESTING

PRIVATE CAPITAL
41  Capital calls: A sense of privacy

42  Feature: The telecom trinity
45  IPO update
47  Arbitrage
VENTURE CAPITAL
46  Venture well:
   The security boom that wasn't
46  VC dealflow

## SCOREBOARD

9  M&A league tables
48  Deal premiums, M&A multiples, fees
49  Weekly recaps of U.S. and non-U.S.
   M&A, accountants on U.S. deals
50  European and trans-Atlantic
   middle-market M&A
51  European venture capital, private
   equity metrics, deal-related bond, loans

## COMMENTARY

52  Rules of the road: Mending fences
   between states and the feds
53  Deal maneuvers: Scooper pooper
55  Postmortem: GE-Heller Financial
58  Deal sense
56  Company index

## THIS WEEK AT THEDEAL.COM
Top stories from The Daily Deal, updated throughout the day

**M&A CHANNEL**
Deals of the week: Top 25 mergers
M&A calendar: Schedule of votes
Deals deferred: Updates on regulatory reviews

**TECH CHANNEL**
Tech lawsuit tracker: List of current cases
Tech movers: Executive changes
Top in tech: Weekly industry review

**VC CHANNEL**
What's hot: Weekly review of dealflow
PC people: Personnel changes
VC sector watch: Dealflow trends

**SPECIAL TOOLS**
The Deal on call: Now, hear the latest M&A news
on your cell phone
The VC deal.com: VC database (www.theVCdeal.com
Auction block news (TheDeal.com/auctionblock)
Dealflows: M&A database (www.dealflows.com)

**COVER ILLUSTRATION** *by* ALAN DINGMAN

VP Associate Publisher: Stephen Goldstein
VP Subscription Sales: Michael Conroy
VP Human Resources: Helene Tomich
VP Operations: Alan Kohl
VP Finance: Roy Cochron

Headquarters
105 Madison Avenue
New York, NY 10016
212-313-9200

San Francisco: 415-362-7520
Washington: DC: 202-429-2900
London: 011-44-20-7440-3996

The Deal (ISSN 1541-3878) is published weekly by The Deal,
LLC. © 2003 The Deal, LLC. The Copyright Act of 1976
prohibits the reproduction by photocopy machine or any other
means of any portion of this publication except with the
permission of the publisher. The Deal is a trademark of The
Deal, LLC. BPA Membership Applied for January 2003

# Editor's letter

It's the *other* California story: disclosure. Several weeks ago the California Supreme Court ordered the University of California to release its numbers on the performance of various private equity investments. That, of course, follows other court decisions forcing public pension funds and endowments to give up the goods on buyout portfolios and the dramatic decision by venture firm Sequoia Capital to boot a few of the transparent-'cuz-I-have-to-be- funds out the door.

No one can tell with any certainty where this is going. But say the two opposed positions— Sequoia and other elite buyout and venture firms on one side, the courts dragging pensions by the scruff of the neck on the other—harden. What will we end up with? At the top will perch a few high-performing shops, which feel no particular need to tap public funds and which will charge a hefty carry. This is easier, of course, for high-octane venture funds like Sequoia, Mayfield or Kleiner Perkins, which invest fewer dollars, than for buyout giants like Kohlberg Kravis Roberts & Co. or Thomas H. Lee. But one could imagine a few buyout shops opting to avoid disclosure by catering to a private clientele. The rest of the funds, the no-longer-quite-so-private-equity contingent, would tap public funds and accept disclosure and valuation standards.

All this, of course, is hypothetical. But it does tap into a larger trend. Essentially Sequoia is taking the leap so many public companies, beset by Sarbanes-Oxley, wayward equity markets and annoying investors, are supposedly contemplating: going private. True, for all the chatter, there is no compelling data that suggests a significant portion of corporate America is going private, though we hear again and again that it's a subject on managers' and directors' minds— and the investment banks are certainly flogging the idea.

But consider an even larger context: The definition of public and private has been shifting over the past few years. Practices once considered kosher and condoned between consenting fiduciaries—from IPO allocations to Dick Grasso's pay to opaque hedge, VC and buyout funds—are now viewed as transgressions against a larger notion of a public (which usually means investor) good. In many of these cases, the justification for a public interest in what was recently accepted as "private" is the market. Thus regulators decry very different situations such as IPO allocations or the Big Board because they "distort" the market. Viewed another way, the scandals have produced a much broader public component of commerce, a counterintuitive development in our purported era of smaller government. Even corporate governance, first modeled as a set of private market mechanisms between shareholders and management, now has been codified in the very public Sarbanes-Oxley.

Why? The sheer size and ubiquity of markets, the bulk of financial institutions (including funds), the diffusion of shareholding, all have brought the public—with its disclosure demands and fresh perspectives on what's legitimate and what's not—into formerly private precincts, including e-mails and attorney confessionals. This may be good, this may be bad; this may be a little of both. But only a fool would deny that it's happening, or that it will produce odd consequences. In a world of increasing transparency, a firm that can turn its back and operate privately, like an Augusta National or a Sequoia, will attain ever-greater status as it becomes ever-more rare. ∎

— Robert Teitelman
Editor in chief

## VIEW FROM THE CITY

# Oily politics

by Brian Cattell



ILLUSTRATION by RODNEY DAVIDSON

International oil companies are accustomed to placing huge bets in the most politically treacherous investment climates, but nothing they've experienced in Burma or Nigeria, Kazakhstan or Alaska, for that matter, has prepared them for what awaits them in Russia.

Misty-eyed optimists have pointed to the past 12 years to the vast potential of the country's natural resources. Now, with commodity prices high and acute political uncertainty afflicting the Middle East, Russia's vast oil reserves are especially enticing.

ExxonMobil Corp. chief executive Lee Raymond apparently thinks so. He sailed into Moscow last week determined to talk up the "new, investment opportunities in Russia" amid speculation that he was about to buy 40% of newly merged Russian oil giant OAO YukosSibneft, now the world's fourth-largest oil company, which boasts a market capitalization of $46 billion.

But Raymond's Moscow visit and his appearance on a panel at the World Economic Forum alongside YukosSibneft chief executive and Russia's richest man, Mikhail Khodorkovksy, happened to coincide with armed men from Russia's federal prosecutor's office surrounding the homes of Khodorkovsky and other company executives.

Russian authorities said the men were conducting searches as part of a three-month-old investigation into business dealings at Yukos, which has already resulted in the jailing of one of the company's major shareholders. But Khodorkovsky, among others, scoffed at the statements, telling everyone who would listen later in the week that the raids were connected to his support of liberal political parties opposed to President Vladimir Putin, who's running for reelection next year.

Putin is generally credited in the West with removing much of the political risk of doing business in Russia. But remember that much of the country's history has been characterized by periods of chronic instability followed by times of temporary stability under strongman leaders. The chaos of the Boris Yeltsin years and the superficial order imposed by Putin fit that pattern. Big Western oil companies, of course, are thoroughly accustomed to operating in such unstable political environments, whether simply chaotic or uneasily authoritarian. But in Russia they face very different political legacies.

Putin's apparent persecution of Khodorkovsky is just one reason Western oil executives should think twice before entering major strategic investments in Russia. The president, after all, has hounded both the man who was the country's richest before Khodorkovsky, tycoon Boris Berezovsky, and powerful media baron Vladimir Gusinsky out of Russia and into exile.

What would it mean for a multibillion-dollar ExxonMobil investment in YukosSibneft if the main architect of the company was suddenly driven out because of his politics?

Even more worrisome for Exxon-Mobil, however, is the country's tradition of state ownership. One potential opponent of Putin's in the coming presidential contest, left-wing economist Sergei Glaziev, strikes a chord in Russia when he says that a natural resources "rent, either in the form of a special tax or through state ownership, must be distributed among all Russia's citizens."

Glaziev shares a commonly held view that a handful of individuals should not indefinitely be allowed to enjoy the proceeds of owning strategic assets originally acquired under extraordinary conditions in the mid-1990s. Putin, deep down, probably believes this, too.

No wonder Khodorkovsky and other tycoons are keen to cash out. Foreign companies should think long and hard about accommodating them. ■

---

## SCOREBOARD • M&A LEAGUE TABLES

### Advisers to U.S. M&A targets
Top 20 ranked by total value of completed deals

| Adviser | No. of deals | Deal value ($bil.) |
|---|---|---|
| Goldman, Sachs & Co. | 62 | $114.5 |
| Credit Suisse First Boston | 81 | 33.8 |
| Morgan Stanley | 34 | 31.4 |
| Merrill Lynch & Co. | 31 | 23.5 |
| Citigroup Inc. | 56 | 23.0 |
| J.P. Morgan Chase & Co. | 36 | 20.8 |
| Wachtell, Lipton, Rosen & Katz | 24 | 20.0 |
| Wasserstein Perella & Co. | 9 | 16.0 |
| Lehman Brothers Inc. | 34 | 14.8 |
| Bear Stearns & Co. | 19 | 13.1 |
| Bank of America Securities LLC | 19 | 12.7 |
| Blackstone Group | 31 | 11.1 |
| Rothschild & Co. | 1 | 7.7 |
| Lazard | 23 | 7.4 |
| Deutsche Bank AG | 3 | 5.8 |
| Dresdner Kleinwort Wasserstein | 2 | 4.4 |
| Evercore Partners | 1 | 4.2 |
| Gleacher & Co. | 1 | 4.2 |
| UBS | 49 | 4.2 |
| Houlihan Lokey Howard & Zukin | 12 | 3.1 |
| ABN Amro | 1 | 3.1 |

Source: Dealogic

### Advisers on non-U.S. target deals
Jan. 1 - Oct. 3, 2003

Top 10 by total deal valuation

#### COMPLETED DEALS

| | Adviser | Bids | Total deal value ($bil.) |
|---|---|---|---|
| 1 | Merrill Lynch & Co. | 63 | $137.2 |
| 2 | Goldman, Sachs & Co. | 86 | 136.2 |
| 3 | J.P. Morgan Chase & Co. | 117 | 122.5 |
| 4 | Citigroup Inc. | 90 | 100.3 |
| 5 | Lazard | 72 | 86.4 |
| 6 | Morgan Stanley | 94 | 75.8 |
| 7 | Rothschild | 115 | 74.3 |
| 8 | Deutsche Bank AG | 89 | 66.8 |
| 9 | Credit Suisse First Boston | 89 | 65.7 |
| 10 | UBS | 106 | 50.7 |

#### ANNOUNCED DEALS

| | | Bids | |
|---|---|---|---|
| 1 | Merrill Lynch & Co. | 58 | $120.8 |
| 2 | Goldman, Sachs & Co. | 60 | 110.3 |
| 3 | J.P. Morgan Chase & Co. | 112 | 100.8 |
| 4 | Lazard | 73 | 94.1 |
| 5 | Citigroup Inc. | 74 | 87.0 |
| 6 | UBS | 102 | 72.0 |
| 7 | Deutsche Bank AG | 80 | 63.8 |
| 8 | Morgan Stanley | 84 | 55.7 |
| 9 | Credit Suisse First Boston | 88 | 54.8 |
| 10 | Lehman Brothers Inc. | 36 | 50.0 |

Based on full amount credit. Includes target and bidder advisers

Source: Dealogic

### Bankers
Lead arrangers of M&A loans
Sept. 17, 2003

| Bank holding company | No. of deals | Market share | Lead arranger volume ($mil.) |
|---|---|---|---|
| J.P. Morgan Chase & Co. | 33 | 25.26% | $11,274.9 |
| Citigroup | 14 | 10.35 | 4,619.8 |
| Bank of America | 32 | 8.98 | 4,008.8 |
| Deutsche Bank AG | 12 | 6.48 | 2,890.5 |
| Merrill Lynch & Co. | 18 | 4.73 | 2,113.8 |
| Goldman Sachs & Co. | 10 | 4.35 | 1,941.5 |
| Wachovia Financial Group | 6 | 3.95 | 1,762.5 |
| Morgan Stanley | 10 | 3.51 | 1,569.8 |
| ABN Amro | 17 | 3.43 | 1,533.0 |
| Lehman Brothers Inc. | 8 | 3.18 | 1,421.5 |
| Credit Suisse First Boston | 10 | 3.01 | 1,343.5 |
| GE Capital Markets | 4 | 2.84 | 1,267.5 |
| GE Electric Capital Corp. | 4 | 2.73 | 1,217.0 |
| BNP Paribas | 3 | 1.95 | 824.3 |
| Wells Fargo & Cos. | 1 | 1.50 | 667.5 |
| Scotia Capital | 1 | 1.34 | 600.0 |
| Mizuho Corp. | 2 | 1.32 | 590.0 |
| Royal Bank of Scotland plc | 9 | 1.28 | 571.5 |
| Bank of Montreal | 1 | 1.07 | 478.4 |
| | 1 | 0.90 | 400.8 |

Source: Loan Pricing Corp./Gold Sheets, New York

### Bankers and lawyers on European M&A deals
Jan. 1 - Oct. 3, 2003

Top 10 advisers by volume of announced deals

#### BANKERS

| | | Investment bank | No. of deals | Volume ($bil.) |
|---|---|---|---|---|
| 1 | Gerardo Braggiotti | Lazard | 7 | $31.1 |
| 2 | Arnaldo Borghesi | Lazard | 3 | 29.4 |
| 3 | Orazie Tirelli | Lazard | 4 | 29.1 |
| 4 | Mauro Brunelli | Banca Intesa SpA | 9 | 24.5 |
| 5 | Matteo Marini | Unicredit Banca Mobiliare | 4 | 23.7 |
| 6 | Marco Samaja | Lazard | 3 | 23.7 |
| 7 | Robert Berle | Rothschild | 3 | 23.7 |
| 8 | Stefano Marsaglia | Rothschild | 2 | 22.8 |
| 9 | Gaetano Micciche | Banca Intesa SpA | 2 | 22.6 |
| 10 | Guido Tognoli | J.P. Morgan Chase & Co. | 2 | 22.5 |

#### LAWYERS

| | | Law firm | No. of deals | Volume ($bil.) |
|---|---|---|---|---|
| 1 | Francesco Gianni | Gianni, Origoni, Grippe & Partners | 10 | $34.5 |
| 2 | William Plapinger | Sullivan & Cromwell LLP | 4 | 33.8 |
| 3 | Sarah Murphy | Freshfields Bruckhaus Deringer | 4 | 33.1 |
| 4 | José María Fernández - Daza | Clifford Chance | 5 | 31.8 |
| 5 | Ramon Hermosilla Gimeno | Ramon Hermosilla & Cia Abogados | 5 | 30.2 |
| 6 | Emiliano Garayar | Gomez Acebo & Pombo Abogados | 4 | 29.5 |
| 7 | Antoni Valverde | Freshfields Bruckhaus Deringer | 4 | 28.8 |
| 8 | Luis Suarez de Lezo | Despacho Albinana & Suarez de Lezo | 4 | 28.6 |
| 9 | Ignacio Galdeando, Monica McConville | Freshfields Bruckhaus Deringer | 1 | 28.6 |
| 10 | Scott Simpson | Skadden, Arps, Slate, Meagher & Flom | 1 | 28.6 |

Source: Mergermarket.com, London

Vol XVIII
No. 107
April – May 2004

Spedizione
in a.p. – 45%
art. 2 comma 20/b
Legge 662/96
Filiale di Milano

# LOMBARD

## THE ITALIAN MAGAZINE OF INTERNATIONAL FINANCE

**Trends: Italy Back to Banks**

**Italian Banks Challenged In Factoring**

**Gottardo's CEO, Netzer, Speaks Out**

Lazard's Gerardo Braggiotti (left), with Claudio Costamagna of Goldman Sachs (center) and Mediobanca's Alberto Nagel

M&A: GOLDMAN AND MEDIOBANCA CHASE

# Five Ways To Success

If **Lazard** made of **utilities** its stairway to the top, **JP Morgan** was the most frequent advisor on **real estate** deals. Meanwhile, **UBM** was the bank **progressing the most** in the league table, and **Vitale & Associati** grabbed the leadership among independent **boutiques**, with **Rothschild** maintaining its leadership in **banking**. Here are the factors behind those performances

## ››› LAZARD: Leadership Needs Energy



Marco Samaja, the partner covering energy and utilities M&A at Lazard Italia

In September 2002, Gerardo Braggiotti and Arnaldo Borghesi agreed with Banca Intesa on a joint venture in investment banking. The bank, of which Corrado Passera had just become CEO, contributed its extensive network of relationships with small- to medium-sized firms, while Lazard brought in the expertise. The alliance seems to work. With 34 deals and an estimated volume of EUR 25 bn, Lazard was back at the top of Lombard's M&A ranking for 2004 after ranking first in 2002. Banca Intesa is indeed one of the reference banks of key groups such as Enel, but has also an extensive coverage of Italian small- to medium-sized firms. Lazard's position in the middle-market, however, tells only part of the story. The energy and utilities sector greatly contributed to the leadership of the French maison. Here Lazard's 7-people team headed by Marco Samaja, the 37-year old partner in charge of industry coverage, managed to handle nine deals in 2003, becoming the most frequent adviser in the industry. "The team was put together in 2000, following the acquisition of gas distributor Colombo by Enel, one of our main clients," recalls Samaja who has been with the advisory since 1994, when it was still dubbed Vitale & Borghesi. Prior to that year, Samaja had worked for Deutsche Bank, with previous experiences at the London branch of BCI. "We understood that that experience might turn out to be very useful because the distribution of gas is one of the main businesses of municipal utilities, which were increasingly approaching the markets," he adds. Indeed, Lazard advised AEM Torino and ASM Brescia on their listing on the Milan stock exchange. Arnaldo Borghesi's good relationship with the Brescia entrepreneurial milieu helped Lazard secure the latter mandate. "But, to some extent, we were also lucky," acknowledges Samaja. The decision made by the Fiat group, another one of Lazard's reference clients, to flank EDF in the acquisition of Montedison in 2001, gave the maison the key to access Italy's second largest power producer; in 2003, Lazard advised Edison on the sale of its Egyptian oil reserves to Petronas.



## >>> JP MORGAN-CHASE: Malls and Hotels Is the Recipe



Guido Tugnoli,
head of M&A
execution
at JP Morgan's
Milan office

Traditionally strong in financial institutions, JP Morgan-Chase finishes fourth in this year's ranking, thanks also its activity in the real estate sector. The six real estate deals – Banca Antonveneta, which bought 50% of Antonveneta Immobiliare; Fenice BV which purchased 50% of Antonveneta Immobiliare; Colony capital which acquired four hotels located in Sardinia; the Dorchester Group which purchased Hotel Principe di Savoia; Simon Property which bought 49% of Gallerie Commerciali; Coop Toscana –Lazio which acquired 25% of Immobiliare Grande Distribuzione –amounted to more than EUR 1.3 bn, representing the bank's second most lucrative sector after FIG. "Real estate will remain one of the most interesting industries in the coming years," says Guido Tugnoli, who runs the bank's execution team in Milan. "JP Morgan-Chase already worked in large real estate spin-off transactions in the past (Telecom Italia), and is one of the leading institutions in real estate financing worldwide, with an industry specific expertise that is difficult to rival." JP Morgan-Chase was also involved in the real estate spin-offs of France Telecom and Swiss Telecom in recent years.

Among the Italian transactions of 2003 (mainly executed by Tugnoli's lieutenant, Stefano Cera), the acquisition of 49% of Gallerie Commerciali by the Simon Property group (SPG) is one of the most important, according to Tugnoli. The deal, he says, proves the growing attention US real estate giants are paying to the Italian market. SPG is, in fact, the largest publicly traded retail real estate company in North America, with a market capitalization of approximately USD 28 bn. Thus, getting this mandate was utterly strategic for JP Morgan-Chase in a long-term perspective. The transaction could also strengthen the bank's role growth in the shopping malls segment, which is a relatively new niche in Italy's real estate sector. Thanks to this deal, in fact, SPG bought 49% of a joint venture with Auchan-Rinascente, which manages commercial malls in the areas immediately leading to Auchan big stores.

Hotels represented the other pillar of JP Morgan Chase's real estate activity in 2003. The acquisition of four hotels in Sardinia by US Colony Capital and the purchase of Milan's famous Principe di Savoia Hotel by the Dorchester group (a unit of Brunei investment agency) mirrors the increasing interest of foreign investors in Italian real estate facilities for tourism purposes. In both transactions, JP Morgan-Chase was on the selling side, managing to get the mandate from a top international player like the Los Angeles-based Starwood Hotels & Resort Worldwide, which operates worldwide through different brands including Sheraton and Westin.

## >>> UBM: The Right Mix



Marino Marin,
head of M&A at UBM

Marino Marin, head of M&A at UBM (the investment banking arm of Unicredito Italiano), spent nine years at Lehman Brothers' New York office, with previous experience at Rothschild. Among the many Italian investment bankers that Lehman has become famous for, Marin is probably the only one who became notorious after moving to another institution. On the other hand, it is difficult for Italians to emerge on the US shore of the Atlantic. When he opted for UBM, Marin knew that the bank's CEO, Pietro Modiano, and the head of corporate finance, Alessandro Gumier, had assigned strategic importance to M&A. So, he had the right mix of motivations he needed to make the grade. Marin got started in late 2001, the following year he ranked 17th in Lombard's ranking, and in 2003, he finished 6th, posting the fastest progress.

In the lapse of two years, he managed to build a 10-person team that brought UBM among Italy's top banks in M&A, finalizing more than 20 transactions in 24 months. Marco Perelli-Rocco, 37, and Antonello Cestelli, 34, are Marin's main right-hand men. The first manager joined UBM from JP Morgan's European headquarters in London; the latter boasts experiences in corporate finance at BCI and Banca Akros.

"My international experience and Perelli's own add up to Cestelli's in-depth knowledge of Italy's corporate and entrepreneurial world, forming the ideal mix of skills to be on the leading edge of the business," says Marin, who stresses the fact that his department does not rely on the financial strength of its parent bank. "We always submit our proposals like any other M&A house, without granting any financing." According to some rumors, the presence of Unicredito among the major shareholders of important industrial groups has sometimes helped. The advisory to Fiat in the sale of Fiat Avio to Carlyle-Finmeccanica is not the only case. In the Olivetti-Telecom Italia deal, for instance, JP Morgan-Chase was the sole advisor to Olivetti in the beginning. Then, when, Olivetti decided it needed more advisors, UBM and Mediobanca got the mandate. Since Mediobanca was a shareholder of Olivetti and Unicredito Italiano was a shareholder of Olimpia, the controlling company of Olivetti, rumors spread that Unicredito Italiano and Mediobanca forced Pirelli's management to increase the number of advisors to get a slice of the pie for their M&A departments. Other market participants say that, with Unicredito Italiano among the shareholders, UBM was only helped in the sense that it got the information first and could follow the evolving situation step by step. Marin dismisses such an assumption: "We had to submit our proposal and go through an examination like any another bank." The fact that UBM is the sole advisor of ENEL in the auction for the privatization of a distribution company in Bulgaria is a partial confirmation of his words.

# VITALE & ASSOCIATI: The Value of Independence ‹‹‹

"Our main strength is independence. Clients are increasingly looking for an advisory service that is free from the conflicts of interests big investment banks face." This is how Guido Roberto Vitale, one of the veterans of Italian corporate finance, explains the excellent result of Vitale & Associati, the advisory firm he founded in 2001, which in 2003 turned out to be the best boutique in Lombard's ranking. That year the firm advised deals for over EUR 1.6 bn, reaching the 16th position in the volume-based league table, and 11th in the ranking by deal number, thanks to the 14 transactions it arranged. "We have no problem in advising a client not to go ahead with an acquisition," Vitale continues, "whereas big investment banks often push for a mandate regardless of the real interest of the client." And there are not only deal-hungry bulge brackets. There are also large Italian banks that are eager to protect the exposure they have with the big industrial groups. Therefore, Unicredito Italiano's UBM, Sanpaolo IMI's Banca IMI, Lazard, which has strong ties with Banca Intesa, and even Mediobanca, of which UniCredito and Capitalia hold the largest stakes, were all excluded on grounds of conflict of interest when it came to shaping the re-organization of the Fiat group, which is deeply indebted with all of the above mentioned groups. Unsurprisingly, Vitale was one of the first bankers involved in the reshuffling of the Turin carmaker.



Guido Roberto Vitale, chairman and founder of Vitale & Associati M&A advisory firm

Another key to success is reputation. After being general director at building company Edilcentro, controlled by Michele Sindona, until 1973, Vitale launched Euromobiliare, with the ambition of creating an alternative to the dominator of Italian finance, Mediobanca. The 66-year old Vitale managed to build a good relationship with the now Prime Minister Silvio Berlusconi back in the Eighties, when he and Arnaldo Borghesi were advising Carlo De Benedetti in the battle for the control of the Mondadori group. The ability of the two impressed both Berlusoni and his right hand, Fedele Confalonieri. As a result, after clashing with De Benedetti in 1992, when they founded the advisory boutique Vitale Borghesi & C, the two remained reference figures for the Fininvest group. This, coupled with the good relationship Vitale has ►

elite 20**04**

# ITALY'S WONDERFUL 50

Riccardo Banchetti
**Paolo Basilico**
Franco Bernabé
**Fabrizio Bonelli**
Riccardo Bruno
**Francesco Caio**
Massimo Capuano
**Michele Carpinelli**
Remy Cohen
**Paolo Colonna**
Giovanni Consorte
**Claudio Costamagna**
Andrea Crovetto
**Tommaso Cucchiani**
Andrea De Vido
**Diego Della Valle**
Mario Draghi
**Sergio Erede**
Riccardo Faini
**Francesco Gianni**
Renzo Giubergia
**Mario Greco**
Paolo Gribaudi
**Vittorio Grimaldi**
Fabio Innocenzi

Edoardo Lombardi
**Guido Lombardo**
Ruggero Magnoni
**Marino Marin**
Christian Miccoli
**Mauro Micillo**
Alessandro Mitrovich
**Pietro Modiano**
Luca Montezemolo
**Mario Monti**
Mario Moretti Polegato
**Alberto Nagel**
Piero Novelli
**Gianemilio Osculati**
Tommaso Padoa-Schioppa
**Corrado Passera**
Alessandro Profumo
**Dante Roscini**
Sandro Salvati
**Alessandro Santoliquido**
Guglielmo Sartori
**Federico Sutti**
Panfilo Tarantelli
**Marco Tronchetti Provera**
Vittorio Volpi



LOMBARD

2004

# THE MATRIX OF IT

| | Institutions | Investment Banking | Corporate Finance | Retail Banking |
|---|---|---|---|---|
| **THE VALUE CREATOR** | **MASSIMO CAPUANO Borsa Italiana** Under his guidance, the Italian equity market increased capitalization fourfold | **CLAUDIO COSTAMAGNA Goldman Sachs** He restored profitability to the European business of the bank | **ALBERTO NAGEL Mediobanca** Between March 2003, when he took charge, and July 2004, Mediobanca shares rose 35% | **ALESSANDRO PROFUMO UniCredito Italiano** His bank has been at the top of Lombard rankings since 2001 thanks to spectacular ROEs |
| **THE RESHUFFLER** | **MARIO DRAGHI Goldman Sachs** He started the era of Italian privatizations, paving the way to a new corporate governance attitude | **MARINO MARIN UBS** Italian M&A team achieved a leading position in the market in two years, under his responsability | **RICCARDO BRUNO Deutsche Bank** He re-vamped the bank's Italian investment banking business | **CORRADO PASSERA Banca Intesa** He turned the bank's retail ratios from 1% to 18% in 24 months |
| **THE INNOVATOR** | **TOMMASO PADOA-SCHIOPPA European Central Bank** Father of the euro, this man is behind the advent of the euro | **DANTE ROSCINI Merrill Lynch** He pushed the bank to the top of the rankings in Europe, both in advisory and capital markets | **REMY COHEN Cohen & Associati** He is one of those who introduced project and asset-backed finance in Italy | **CHRISTIAN MICCOLI ING Direct** Conto Arancio turned out to be one of the most successful banking products |
| **THE EMERGENT** | **RICCARDO FAINI Economist** Formerly an executive director at the IMF, he is now an advisor to the French government | **PIERO NOVELLI UBS** Just appointed as head of UBS' European M&A, he brought Merrill Lynch, the company he worked for previously, at the top of Italian M&A in 1H 2004 | **FABRIZIO BONELLI Banca Intesa** He brought Banca Intesa to leadership in Italian real estate finance | **FABIO INNOCENZI BP Verona e Novara** One of the youngest top managers, he is at the helm of the best performing regional bank |
| **THE TRENDSETTER** | **MARIO MONTI EU Commissioner** His office has exerted a very strong influence on Europe's M&A business | **FRANCO BERNABE' Rothschild** From oil, to TLC, to finance, he surfs the most dynamic businesses on the international scene | **PAOLO COLONNA Permira** A pioneer of the Italian private equity, he drove Permira to post the best IRR in the market | **ANDREA CROVETTO Banca di Roma** He set up the framework to bring the equity derivatives products to retail |





matrix **introduction**

# The Italian Benchmarks

Many Italian bankers, financiers, industrialists and regulators secured the appreciation of international investors and markets. Lombard selected 50 of them

Lombard was born in the mid eighties, on the occasion of an annual meeting of the IMF, when the world economy was becoming increasingly interconnected, a phenomenon that, around ten years later, would be labeled "globalization". At that time almost all of Italy's government debt was held by residents, and the banking industry was sealed off from outside competitors.

But it became increasingly evident that the Italian financial system could not remain in the splendid isolation it had been kept that far. At the same time, Italian know-how began to spread among international institutions and market players. In 1987, Mario Monti was appointed member of the European Commission's Committee in charge of drafting a banking legislation reform. Tommaso Padoa Schioppa was attending the first meetings of the committees whose work was to pave the way to the European Monetary Union. Claudio Costamagna was called by Goldman Sachs, one of the world's most prestigious investment banks, to set up an Italian office. Francesco Caio began his career at the London office of McKinsey. Almost 20 years later, all four executives had attained key positions in powerful

institutions. Another personage, Corrado Passera, obtained great consideration among international investors after he turned a clumsy state-owned organization such as the Italian Post Office into a powerful distributor of financial products capable of raising top bankers' concern. And now he is taking analysts, and markets, by surprise with the results he is posting at the wheel of a large, but poorly articulated organization such as Banca Intesa.

In the following years, many others followed the example of the "fabulous five" and climbed to the top rungs of the career ladder at both Italian and international institutions and companies. They brought innovation from the outside; they reshuffled or built from scratch businesses that would eventually achieve resounding success and they set new trends, earning the reward of high-profile international assignments. They are very different people, who share a common trait, though. "Italians are great dealmakers because they know how to bring the parts together," says an Anglo-Saxon who knows Italians well, Hugh Malim of Barclays Capital. In this matrix the reader will find the people who managed to bring Italian style into the international financial and industrial arena.

## THE FIVE CRITERIA

Lombard chose five ways to achieve leadership, and created as many cathegories accordingly:

- THE VALUE CREATOR
  Those who managed to boost or restore profitability

- THE TRENDSETTER
  Those who set new operating standards in their businesses or activities

- THE INNOVATOR
  Those who introduced new products and markets in Italy

- THE RESHUFFLER
  Those who re-arranged their business or set up a successful operation from scratch

- THE EMERGENT
  Those who are rapidly escalating the career path in their businessesbacked also by interna tional experiences

## MARIO DRAGHI

**POSITION:** Deputy Chairman, Goldman Sachs Intl.
**REASON:** As director of the Treasury, he launched the Italian privatization era, transforming the country's financial markets

Draghi, 57, in his current post since 2002, owes much of his credit to his experience (1991-2001) as general director of the Treasury. During that period, the country undertook a robust public debt restructuring and met the Maastricht criteria.
Then it started the privatization campaign that brought around EUR 103 bn to the Treasury.
Credito Italiano, Ina, Enel, Eni and Telecom Italia were among the companies privatized. The process increased the presence of international investors in Italy and helped to create a more market-oriented financial system.

## MARINO MARIN

**POSITION:** Head of M&A, UBM
**REASON:** In charge since late 2001, he created from scratch a team which has turned out to be a leading player in Italy

Marin, 36, was called on board in November 2001 after Pietro Modiano and the head of UBM's investment banking, Alessandro Gumier, had decided to create a M&A department. In less than three years Marin managed to bring UBM among Italy's top players.
The institution ranked seventh in the last Lombard ranking. With a 10-year experience in New York –Lehman Brothers and Rothschild–, Marin now heads a team of ten people, where Marco Perelli-Rocco, 37, and Antonello Cestelli, 34 are his right-hand men.

## RICCARDO BRUNO

**POSITION:** Head of Italian Investment Banking, Deutsche Bank
**REASON:** He revamped the bank's Italian investment banking business

Former general director of Cofiri (the investment bank of IRI) Riccardo Bruno, 45, joined the German bank well aware that his mission meant serving up a broad range of products for the 10-12 main Italian corporate clients which account for 85% of the corporate finance revenue pool.
In order to do this, he took advantage of his relationships with companies close to IRI. One of his key contacts was Piero Gnudi, former chairman of IRI and now chairman of Enel, who has close links with Bologna's entrepreneurs.
These include Gazzoni Frascara, Giorgio Seragnoli, and Fiat's Luca di Montezemolo.
Bruno is in touch with all of them and Deutsche Bank and Montezemolo are the main shareholders of the investment vehicle Charme.

## MAURO MICILLO

**POSITION:** Head of finance, Capitalia
**REASON:** He was hired to establish Capitalia as a capital markets franchise

Like Capitalia CEO Matteo Arpe, Micillo, 34, began his career at Mediobanca. Among other assignments, Micillo is responsible for the financial products factory, which was launched in July 2002, just after the group was "re-founded" under the Capitalia tag. Its aim is to create and market structured instruments, through the use of derivatives. This allowed Capitalia to return to top rankings in derivatives like OTC options.

## ALESSANDRO MITROVICH

**POSITION:** Country head, Royal Bank of Scotland
**REASON:** He turned an operation into a market leader starting from scratch

After 12 years at JP Morgan Chase, in 2002, Mitrovich, 36, had to build RBS' Italian activity from scratch. The only point of strength was William Pavone, head of Italian project finance. Little by little, Mitrovich built the Italian team. Real estate finance specialist Roberto Benaglia was hired from Eurohypo, and Alberto Zaffignani, head of fixed income, joined from Jp Morgan Chase; Gianfranco Mattei, former deputy CEO at Banca IMI; Santiago Mauri, from Banca IMI, now in charge of structured finance, and Pietro de Giorgio, from

Deutsche Bank, covering credit derivatives, were the last arrivals. Italy is now RBS' second European market.

## SANDRO SALVATI

**POSITION:** Chairman, Alleanza
**REASON:** He transformed the company into a multi-channel insurer

Lloyd Adriatico's former chairman, Salvati, 58, moved to Alleanza in 1998. In six years he transformed the life insurance company into a multi-channel insurer, with positive impacts on financial results: in 1H 2004 new premiums grew 49% on the same period of 2003, thanks also to Intesa Vita, the bancassurance joint venture with Banca Intesa.

## FRANCESCO GIANNI

**POSITION:** Managing Partner, Gianni, Origoni & Partners
**REASON:** He broke the alliance with Linklaters and opted for a stand-alone approach keeping profitability high

Known for being one of the most important Italian business lawyers, Francesco Gianni, 52, broke his link with UK's Linklaters to defend his ability to generate business independently. In the past, Gianni had worked as a research assistant on EU-related matters, including those involving competition. This turned out to be a key issue, particularly in the case of mega-deals. This is why his practice is Italy's most profitable one.

**EXHIBIT C**

**THIS EMPLOYMENT CONTRACT** is made the day of                    2005

**BETWEEN:**

(1)     **CANTOR FITZGERALD EUROPE** a company registered in England with number 2505767 whose registered office is at One America Square, London, EC3N 2LS (the "Company")

(2)     **MARINO MARIN** of via Porta Tenaglia 3, Milan 20121, Italy ("You")

The parties agree that the terms of your employment are set out below (the "Contract") and in the attached terms and conditions (which are incorporated by reference, the "Terms and Conditions"), together referred to as this "Agreement". The terms in clause 3 herein are offered to you in confidence and shall not be disclosed (without the Company's consent) by you to any third party, save as required by law.

# 1     Commencement of Employment

(a)     The provisions of this Agreement will come into effect on the date hereof. Your employment under this Agreement will commence as soon as you are free and able to do so, but in any event no later than 31 December 2005 (the "Commencement Date"). You shall take all such lawful action (including resigning from your current employment) as shall be necessary to enable you to comply with your obligations under this Agreement and commence your duties with the Company at the earliest possible time.

(b)     Your employment is for an initial period of two (2) years from the Commencement Date, (the "Initial Period"). Thereafter (subject to the other provisions in this Agreement) it shall be extended automatically for successive periods of one (1) year (the "Renewal Period"), on the same terms and conditions as contained in this Agreement, from the end of the Initial Period or the end of any subsequent Renewal Period, as appropriate, unless otherwise agreed.

(c)     Either party may give notice to the other in writing to terminate the Agreement, such notice to be given on any date within the last two (2) weeks of the final month of the Initial Period or a Renewal Period (as appropriate). The notice shall terminate your employment on the expiry of three (3) months (which period of notice the parties agree is reasonable) from the latest date notice could have been given pursuant to this sub-clause.

(d)     No period of previous employment with a former employer will count as part of your continuous employment with the Company.

## 2   Job Title, Place and Hours of Work

(a)    You will be employed as a Managing Director, Head of Southern European Investment Banking of the Investment Banking Division (the "Division") of the Company.

(b)    You will work for the Company or on secondment with an Associated Company in the London offices, or in such other European or USA offices of the Company as the Company may reasonably require.

(c)    Your normal hours of work will be 7.15am to 5.30pm on Monday to Friday.

## 3   Compensation

(a)    You will be paid a fixed draw of a minimum of €101,000 (one hundred and one thousand euros) per annum, which shall be adjusted quarterly (which for the avoidance of doubt shall be upwards should us US Dollar appreciate over the Euro) at the end of each quarter in accordance with the then current exchange rate (as published in the Financial Times on the working day on or nearest the relevant quarter), less such applicable tax and national or social insurance contributions (the "Fixed Draw"). The Fixed Draw shall be paid monthly 30 days in arrears in accordance with the Company's then accounting policies and practices, as applicable from time to time. The Fixed Draw shall be deemed to accrue equally from day to day and shall be apportioned and paid on such basis. The Fixed Draw will be reviewed by you and the Company from time to time and either you or the Company may adjust and/or increase the amount of the Fixed Draw from time to time as mutually agreed between you and the Company.

(b)    You will be eligible to earn commission payments ("Commission Payments") on net revenues generated by you, payable quarterly, as follows:

(i)    13½% of net revenues generated by you (as determined by the Company in its sole and absolute discretion), payable quarterly in arrears in cash. You must be employed by the Company at the time any commission payment is payable to be eligible and subject to the provisions of sub-clause 3(c) below

(ii)    3% of net revenues generated by you (as determined by the Company in its sole and absolute discretion) in the form of Grant Units (as such term and other capitalized terms used herein and not defined are defined in the Partnership Agreement of Cantor Fitzgerald, L.P., as amended and restated as of May 21, 2004 (the "Partnership Agreement")) and a credit to a Grant Tax Payment Account, subject to the terms of an Award Agreement to be executed by you and Cantor Fitzgerald, L.P. The Grant Award will be made annually. You must be employed by the Company at the applicable time in order to receive the Grant Award.

(c)    Your entitlement to being awarded and/or receiving any Commission Payments in cash or Grant Awards under this clause is conditional on the Company not having given notice to terminate your employment, that your employment has not terminated lawfully, that you remain employed at the date of payment, that you have not given notice, or attempted to terminate or procure a release from this Agreement, you have not entered into an agreement with another employer, nor are you subject to any regulatory investigation or subject to any formal, written disciplinary procedure or sanction. The Company may alter, amend or add to these conditions from time to time in its sole and absolute discretion.

(d)    The terms of this clause 3 are confidential and shall not be disclosed (without the Company's prior consent) by you to any third party, save as required by law.

**4    Benefits**

(a)    In addition to your monetary remuneration, you may be eligible to participate in the benefits schemes set out in clause 2 of the Terms and Conditions.

(b)    During the Initial Period the Company will provide you with housing at a standard as previously discussed and agreed.

(c)    During any period of time spent on secondment in the Company's offices in Milan, you will be eligible to receive a housing allowance of €49,000 per annum.

(d)    During the Initial Period the Company will provide you with either a car allowance at a standard as previously discussed and agreed or the use of a leased car.

**5    Notice of Termination**

(a)    You are referred to the additional provisions in the Terms and Conditions.

(b)    During any period after you or the Company has given notice to terminate your employment or if you should otherwise seek to leave your employment with the Company, then the Company will at its discretion be under no obligation to assign any duties to you or to provide any work for you, may transfer you to a different product area and/or will be entitled to exclude you from its premises. This will not affect your entitlement to receive your Fixed Draw (if any).

(c)    During any period of garden leave under this clause 5, you agree that:

(i)    save for routine social contact, you will not contact employees or clients of the Company with whom you have previously dealt while employed by the Company; and

(ii)    if requested to do so, you must return immediately to the Company any Company property, any Associated Company's property and any property of its or their clients.

## 6    Protection of the Company's Interests

(a)    In order to safeguard the goodwill and confidential information of the Company and Associated Companies in connection with their clients and employees, you hereby agree to the restrictions set out in this clause 6.

(b)    During your employment and for a period of 12 months after its termination you will not solicit or interfere with or endeavour to entice away from the Company or any Associated Company any Employee or Supplier.

(c)    During your employment and for a period 3 months after its termination you will not:

(i) solicit or interfere or endeavour to entice away from the Company or any Associated Company any Client; or

(ii) in competition with the Restricted Business, seek to procure orders from, deal or carry on business with, or transact business with, any Client; or

(iii) engage the services of, render services to or become interested in as owner, stockholder, partner, lender or other investor, director, officer, employee, consultant or otherwise) any business activity that is in competition with the Restricted Business.

(d)    The obligations imposed on you by this clause 6 extend to you acting not only on your own account but also on behalf of any other firm, company, business or other person and shall apply whether such party or person acts directly or indirectly.

(e)    You acknowledge that:

(i) the restrictions set out above are reasonable and necessary for the protection of the legitimate interests of the Company and/or any Associated Company and that, having regard to those interests, these restrictions do not work unreasonably on you; and

(ii) the restrictions shall apply in relation to all clients and counterparties in respect of whom they are expressed to apply notwithstanding that such clients and counterparties may have been introduced to the Company or any Associated Company by you (or any person under your control) before or during your (or his/her) employment with the Company or any Associated Company any and all of your relationships from time to time with clients of the Company and/or any Associated Company are the property of the Company and/or its Associated Company.

(f)    If the Company transfers all or part of its business to an Associated Company or to a third party (in either case, a "Transferee") the restrictions contained in this clause 6 shall, with effect from the date of your becoming an employee of the Transferee, apply to you as if references to the Company included the Transferee and references to any Associated Company are construed accordingly and as if references to Clients or counterparties or Suppliers or Employees are of the Company and/or Transferee and their respective Associated Companies.

(g)    The restrictions entered into by you in paragraphs 6(b) and 6(c) are given to the Company for itself and as trustee for each and any Associated Company. In accordance with the Contracts (Rights of Third Parties) Act 1999, any Associated Company may rely upon and enforce the terms of this paragraph 6 against you.

## 7    Governing Law

This Agreement shall be governed by and construed in accordance with English law. The parties hereby submit to the exclusive jurisdiction of the English courts as regards any claim or matter arising out of or in connection with this Agreement.

## 8. Definitions

(a)    "Associated Company" means any company, partnership or other entity controlled by, or controlling, or in common control with, the Company or its parent. A person, company, partnership or other entity shall be deemed to control another person, company, partnership or other entity if the former person, company, partnership or other entity possesses, directly or indirectly, the power to direct, or cause the direction of, the management and policies of the other person, company, partnership or other entity whether through the ownership of voting securities or partnership interests, representation on its board of directors or similar governing body, by contract or otherwise. Where you are seconded to an Associated Company or, whilst employed by the Company, you in fact perform some or all of your services for an Associated Company, in your employment contract or in these terms and conditions references to the Company shall be construed to refer to that Associated Company where appropriate.

(b)    "Client" means any client or counterparty of the Desk (or any desk to which you are moved) of the Company or any Associated Company (whether a company or an individual), with which or with whom you have had material and/or regular dealings in the course of your duties or at any time during the 12 months prior to the termination of your employment.

(c)    "Employee" means any person whom you have managed or had material and/or regular dealings with in the 12 months prior to the termination of your employment and who is employed by the Company (or an Associated Company) in a senior or managerial capacity or in any technical, IT, sales,

marketing, business development role, with the exception of non-management (clerical or administrative or manual) staff.

(d) "Restricted Business" shall mean the business carried on by the Company or any Associated Company in which you have been involved to a material extent during the 12 months immediately prior to the termination of your employment.

(e) "Supplier" means any person, firm, company or other entity whom of which at any time during the 12 months before your employment terminates was a supplier or prospective supplier of the Company (or any Associated Company) and with whom you had material and/or regular dealings.

This Agreement constitutes a contract between you and the Company save that it shall not be binding and enforceable unless or until executed by the representative of the Company set out below. Please sign and return both the enclosed copies of this Contract and the Terms and Conditions as confirmation that you have received and accepted these. On signing these documents you represent to the Company that your acceptance of their terms do not cause you to violate any current contract of employment, arrangement or commitment in any form whatsoever and that you have taken and received appropriate legal advice. One copy of each of these documents will be returned to you after signature of the Contract on behalf of the Company and the other copy of each will be placed on your Personnel file.

Signed for and on behalf of the Company       ...........................

**ELON SPAR**
**MANAGING DIRECTOR**

**Date** ...........................

Signed by the employee       ...........................

**MARINO MARIN**

**Date** ...........................

# TERMS AND CONDITIONS
## OF CANTOR FITZGERALD EUROPE

1.     **Your Obligations, Duties and Hours of Work**

1.1     You are required to well and faithfully serve the Company and to use your best endeavours at all times to promote and develop its business and reputation and to act in the best interests of the Company.

1.2     In view of your position and the nature of the Company's business you will be expected and required to work outside the normal hours of work dependent upon market conditions and other factors inherent in the business. In accordance with Regulation 5 of the Working Time Regulations you agree that Regulation 4(1) of the Working Time Regulations shall not apply to your employment with the Company. At any time during your employment you or the Company may give three months' notice in writing that this paragraph shall cease to apply with effect from the expiry of the said three months' notice.

1.3     You agree to comply with such reasonable instructions as the Company (or any Associated Company) may give from time to time including in relation to its discretion to allocate customers, to reimburse or set limits on expenses and to require you to comply with rules and procedures affecting your employment which the Company may from time to time lawfully and properly introduce, including the provision of the Employee Handbook. The Company will, where practicable, give you four weeks' notice of any new rules or procedures affecting you.

1.4     You agree to comply with any substance misuse policies of any Exchange or financial services regulator of which the Company is a member.

1.5     You must maintain the highest standards of honesty and fair dealing in your work for the Company. Great importance is attached to the observance of the Company's policies and procedures, particularly the Compliance Manual, and the common law, regulations or codes or principles made pursuant to all applicable laws and regulations including without limitation the Financial Services and Markets Act 2000 or any of the Self Regulating Organisations (SROs) including The Financial Services Authority. You acknowledge that any serious or substantial breach of any of these obligations will be regarded as gross misconduct and is likely to result in your summary dismissal.

1.7     In order to retain and enhance the Company's standing and integrity at the forefront of the business community in the United Kingdom and internationally, your conduct in dealings with members of the public and customers of the Company must be totally professional.

2.     **Benefits**

You will be notified separately of your eligibility for benefits such as health insurance and permanent health insurance. Your eligibility for such schemes is subject to the terms and rules of the scheme prevailing from time to time. In particular (but without limitation) you must provide your full co-operation in connection with any claim made on your behalf under such a scheme(s) and you are at all times responsible for providing any medical evidence that may be required by the insurers. Should the insurers refuse your claim, the Company will be under no further obligation to pay

any remuneration or provide other benefit to you and you expressly waive any express or implied term to the contrary. The Company reserves the right to vary, and/or replace any health insurance and/or permanent health insurance scheme(s) from time to time at its absolute discretion.

3.      **Pension**

Save as required by law in connection with a stakeholder pension, there is no Company pension. Accordingly, there is no contracting-out certificate in force in relation to your employment and unless you make private pension arrangements, you must contribute to the State Earnings Related Pension Scheme.

4.      **Expenses and Deductions**

4.1     You will be entitled to the reimbursement of all reasonable expenses properly and legitimately incurred in the proper performance of your duties in compliance with the Company's policies and practices provided that you complete the Company's expenses claim form to its satisfaction and submit satisfactory supporting evidence.

4.2     If at any time during your employment you have liabilities to the Company, or any Associated Company, whether under your employment contract or otherwise, either actual or contingent (where there is a likelihood that a future liability will occur), including but not limited to loans, advances, relocation expenses or excess holiday payments, it is specifically agreed that the Company may deduct the sum or sums in respect of such liabilities from time to time owed to it from any payment otherwise due to you from the Company howsoever arising including your final pay. If a likely future liability does not occur any money deducted on account thereof shall be released as soon as reasonably practicable.

4.3     The Company will deduct from your salary or other payments due to you such sums as shall be necessary to satisfy income tax or national insurance contributions arising out of your employment.

5.      **Holiday Leave**

5.1     Save as otherwise agreed with the Company, you are entitled, in addition to bank and statutory holidays (which the Company recognises), to 20 working days paid holiday in each complete holiday year. The holiday year runs from 1 January to 31 December. Holiday must be taken at times agreed with the person designated by the Company for this purpose and may not be carried forward from one calendar year to the next.

5.2     You agree that the Company may require you to work on all or any bank and/or public holidays in order to fulfil the requirements of your position. If your employment commences or terminates part way through the holiday year, your entitlement to holiday during that year will be assessed on a pro rata basis and for the purposes of this clause holiday accrues at the rate of 2.08 days per month.

5.3     The Company reserves the right during any period of notice of termination of your employment, or during any period in which the Company does not require you to perform your duties during your employment, to require you to take any accrued holiday leave.

5.4     Upon termination of your employment, you will not be entitled to be paid in lieu of holiday leave accrued to you but untaken in excess of your entitlement to annual

leave under the Working Time Regulations, namely 1.66 days per month.   For the purposes of this paragraph, any payment in lieu will be at the rate of 1/260ths of your annual fixed draw per day.   In any holiday year, the Company may deduct any holiday leave taken in excess of your entitlement accruing from your salary at the rate of 1/260ths per day by which your entitlement is exceeded.

6.     **Sickness**

6.1     If you are ill and unable to come to work you must ensure that your Departmental Manager (or his designate) is informed of your absence at the earliest opportunity, and in any event no later than three hours after your regular start time.   You must advise your manager how you may be contacted while you are not in the office.   If you cannot call, you must arrange for someone else to do this.   Failure to notify the Company of any absence, without good reason, will be treated as unauthorised absence and may lead to disciplinary action, including dismissal, and/or deductions being made from or non payment of your remuneration.   You are responsible for ensuring that the Company is kept fully informed on a day to day basis about your condition and in particular your likely date of return to work.

6.2     You will be entitled to statutory sick pay provided you comply with the Company's notification procedures. (Details of your entitlement in accordance with the relevant legislation can be obtained from the Human Resources Officer). Subject to the Company's policy from time to time, the Company will pay you your salary for up to a maximum aggregate period of 10 working days in any period of 12 months. Thereafter any additional payment during sickness absence shall be at the absolute discretion of the Company.   It is the Company's policy not to make any additional payments if you are sick during your notice period.

6.3     If you are absent from work for more than three consecutive working days, you may be required to provide a medical certificate from your doctor to Human Resources. Failure to comply with your obligations under this clause may result in disciplinary action, including dismissal, or deductions from or non-payment of your remuneration. If you are absent from work for a period in excess of one month and you then notify the Company that you are fit to return to work, you agree that the Company may postpone your return until it has received a certificate from a medical advisor nominated by the Company pursuant to paragraph 6.4 below which confirms that you are fit to return to work.   You shall not be entitled to receive any payment from the Company (other than statutory sick pay if appropriate) during any period prior to receipt of such certificate by the Company.

6.4     The Company may require you to undergo examinations (including where appropriate, blood and other tests) by a medical adviser appointed or approved by the Company.   You agree that the medical adviser may disclose to the Company the results of the examination and discuss with the Company his or her opinion of your ability to properly discharge your duties.

7.     **Termination of Employment**

7.1     Notwithstanding anything to the contrary in your employment contract and these terms and conditions, the Company may dismiss you summarily (i.e. without notice) in circumstances where it is entitled to do so at common law, including, but not limited to, substantial breach of any terms of the employment contract and these terms and conditions or the Company's policies and procedures, wilful refusal or neglect to carry out instructions or duties, dishonesty or other instances of serious misconduct or serious incompetence.   You are advised to refer to the Employee

Handbook for a non-exhaustive list of the examples which are normally regarded as gross misconduct.

7.2     Upon the termination of your employment (and during any period of suspension or garden leave in accordance with clause 5 of the Contract and paragraph 8 below), you must return immediately to the Company any Company property, any Associated Company's property and any property of the Company's or any Associated Company's clients, including but not limited to all keys, documents, lists, papers, business cards, credit cards, security and computer passes, mobile telephones, records and computer disks or any other media on which information is held relating to the business of the Company or any Associated Company or their clients together with any copies thereof.

7.3     In the event that you are not, in the opinion of the Company, physically or mentally fit to perform your duties your employment may be terminated upon one month's notice in writing. Before taking such action the Company will consult with you and obtain a medical opinion if necessary. Without prejudice to the foregoing, if you cannot work or perform your duties because you are ill or injured for six consecutive months in any period of 12 months, the Company may terminate your employment on one month's notice.

7.4     The notice periods set out above do not apply to retirement. Your employment will terminate automatically on your reaching the age of 55, in the absence of a specific agreement to the contrary.

## 8.     Grievance, Dismissal and Disciplinary Procedure

8.1     Where any grievance and dismissal and disciplinary procedure implemented by the Company from time to time exceeds statutory obligations, the procedure is not binding upon the Company and does not form part of your terms and conditions.

8.2     The Company's current dismissal and disciplinary procedures are set out in the Employee Handbook. If the Company determines that you have committed a disciplinary offence, it reserves the right to impose a penalty upon you commensurate with the disciplinary offence committed. If you are dissatisfied with a disciplinary decision to dismiss you, in accordance with the Company's current dismissal and disciplinary procedures, you should apply in writing to the Head of the Human Resources Department.

8.3     In circumstances where the Company considers it reasonable (including but not limited to, investigating any disciplinary matter against you) it reserves the right at its sole discretion, to require you to remain at home on paid leave for a period of no more than three months in any 12 month period or to assign to you such other duties consistent with your abilities in addition to or instead of your duties herein. During any period of suspension, you agree that save for routine social contact, you will not contact employees or clients of the Company with whom you have previously dealt while employed by the Company and if requested to do so, you must return immediately to the Company any Company property, any Associated Company's property and any property of its or their clients in accordance with paragraph 7 above.

8.4     If you have a grievance you should write to your line manager (copied to the Head of the Human Resources Department) in the first instance if you are unable to resolve it informally. If the grievance remains unresolved or if it is not appropriate to resolve it with your line manager, you should apply in writing to the Head of the Human Resources Department, who will allocate an appropriate person to deal with it.

5

Further details of the process are set out in the grievance procedure which is in the Employee Handbook.

9.   **Company's Absolute Discretion and Liquidated Damages**

Where the Company expressly reserves any right at or in its absolute discretion, and whether in your employment contract or in these terms and conditions, you agree and acknowledge that the implied term of mutual trust and confidence nor any other implied term which is alleged to qualify such discretion, shall not apply to the exercise of that discretion.  For example, in relation to an absolutely discretionary bonus, the Company is entitled to award no bonus if it considers that this would be appropriate.

10.   **Undertaking and indemnity**

You represent, undertake and warrant that by the execution and/or the performance of your duties under your employment contract and these terms and conditions, you are not (and will not be) in default under, or in breach of, any agreement (including, but not limited to any agreement requiring you to preserve the confidentiality of any information which is the property of any third party) to which you are a party to or which you may be subject.

11.   **Confidentiality and Non-derogatory Comments**

11.1   You shall not at any time during your employment nor after its termination directly or indirectly use, or copy or divulge Confidential Information to the detriment or prejudice of the Company, any Associated Company, or any of its or their clients.

11.2   "Confidential Information" means information of a confidential or secret nature, trade secrets or commercially sensitive information relating to the business or financial affairs of the Company or any Associated Company or any person (whether agents, customers, prospective customers or suppliers) having dealings with the Company or any Associated Company.  Confidential Information shall include: details and lists of individuals, customers or counterparties or other organisations with whom the Company or any Associated Company transacted business during your employment (including their requirements, financial standing, the terms of business and any dealings with them), strategic business planning and financial information of the Company or any Associated Company (including results and forecasts of any broking or trading desks, financial instrument transaction systems, details of employees and officers and their remuneration/benefits and the terms of their employment with the Company or any Associated Company), any information concerning telecommunications systems and/or data processing/analysis, (including inventions, developments or improvements, designs, processes, software (including source codes)) or copyright works discovered or used by the Company (or any Associated Company) or their employees and any information which you are told is confidential or which you are aware or ought reasonably be aware has been given to the Company or any Associated Company in confidence by other persons.  The foregoing list is not exhaustive.

11.3   You shall not be restrained from disclosing any Confidential Information which you are authorised to disclose in the proper performance of your duties by the Company or which is or comes into the public domain (other than as a result of a breach of your obligations under your employment contract) or is ordered to be disclosed by a court of competent jurisdiction, a regulatory authority or otherwise required to be disclosed by law.

11.4    During your employment or at any time after its termination, you must not make, publish or otherwise communicate to third parties (both internally and externally) any disparaging or derogatory statements, whether in writing or otherwise, concerning the Company, or any Associated Company, or any of their respective officers or employees and you acknowledge that acting in breach of this provision will harm the business of the Company and/or any Associated Company and constitutes a serious breach of your employment contract.

11.5    The covenants contained in this paragraph 11 shall survive the termination or expiration of your employment.

12.    **Inventions and Intellectual Property**

12.1    You must disclose to the Company any invention, or improvement, design, process, information, copyright work, trade mark or trade name or get-up made, created or discovered by you during the continuance of your employment (whether patentable or not and whether or not patent protection has been applied for or granted or registered) which concerns or is applicable to products or services provided by or relating to the business of the Company or any Associated Company or capable of being used or adapted for use therein or in connection therewith ("Intellectual Property") made or discovered in the course of your employment and shall belong to and be the absolute property of the Company or any such Associated Company as the Company may direct (to the extent permitted by law).

12.2    To the extent that such Intellectual Property has not vested or does not vest in the Company by operation of law, you hereby irrevocably assign to the Company, including by way of future assignment, with full title guarantee, absolutely and free from all encumbrances, all your rights, title and interest in any and all intellectual property rights, in, or relating to the Intellectual Property together with all accrued rights of action in respect of any infringement of any such intellectual property rights.

12.3    You shall at all times whether during your employment or after its termination:

12.3.1    supply all such information and give such assistance as is necessary in the opinion of the Company (or any Associated Company) to enable it or them to exploit the Intellectual Property to the best advantage; and

12.3.2    execute all such documents and take all such steps required for vesting the Intellectual Property rights in the Company or any such Associated Company or in such other person as the Company may specify.

13.    **Data Protection and Monitoring**

13.1    You consent to the Company or any Associated Company holding and processing both electronically and manually, the data (including personal sensitive data and information contained in e-mail and e-mail attachments) it collects, stores and/or processes, which relates to you for the purposes of the administration and management of its business. You also agree to the Company or any Associated Company forwarding this data to other offices it may have which may be outside the European Economic Area for storage, processing, or administrative purposes and you consent to the Company or any Associated Company disclosing your personal data to third parties where such disclosure is for the legitimate business purposes of the Company or any Associated Company.

13.2    To ensure regulatory compliance and for the protection of its workers, clients/customers and business, the Company reserves the right to use surveillance equipment and to monitor, intercept, review and access your telephone log, internet

usage, voicemail, e-mail and other communication facilities provided by the Company which you may use during your employment. The Company will use this right of access reasonably but it is important that you are aware that all communications and activities on our equipment or premises cannot be presumed to be private.

13.3   The Company does not permit employees to covertly tape or record electronically by any means any individual with whom they interact in the course of their duties. Any employee who does so (without the Company's authority) in breach of this clause will be subject to disciplinary action and the Company will regard their actions as gross misconduct.

14.   **Entire Agreement**

14.1   These terms and conditions together with the employment contract represent the entire agreement between the parties with respect to your employment. Definitions used in the employment contract shall have the same meaning as in these terms and conditions, and vice versa. Each party confirms that it has not relied upon any information, representations or warranties not expressly contained herein.

14.2   The employment contract and these terms and conditions may not be amended, supplemented or modified except by written agreement executed by you and the Company.

14.3   No provision of the employment contract and these terms and conditions will be waived or deemed to be waived, unless such waiver is in writing signed by the waiving party. No such waiver shall be a waiver, or deemed to be a waiver, of any other or further obligation or liability of the party or parties in whose favour the waiver was given.

14.4   You agree that the Company may assign this contract to a creditworthy Associated Company in whole or in part and that if the Company shall choose to do so, you shall have no claim against the Company in connection with such assignment.

MARINO MARIN                                                    DATE

**EXHIBIT D**

# YAHOO! MAIL

Print - Close Window

**Subject:** RE: trip to Boston

**Date:** Tue, 2 Aug 2005 18:21:31 -0400

**From:** "Linda Bialecki" <linda@bialecki.com>

**To:** "Marino Marin" <marinpersonal@yahoo.com>

**CC:** shines@laneberry.com, flane@laneberry.com

Marino,

I spoke to Steve Hines. He has been expecting to pay for your trip over here at Lane Berry's invitation. Also he certainly expects you to fly business class (especially with your back).

You must take care of your back first, of course. So they are very happy to see you when ever it makes most sense for you....as long as they are not risking loosing you to a competitor.

I told Steve you would have a much better idea after your Thursday hospital visit. Steve and all of his brothers have had back operations, so you are talking to a very sympathetic person.

So health first. Good luck on Thursday.

Ps. You probably know from them that LaneBerry is having a banner year with lots of sell side mandates, with a very large new one signed up last week. http://www.laneberry.com/transactions/search.cfm?nav=12&blsSubmitted=1

Regards, Linda

BIALECKI INC
780 Third Avenue      Office  212-755-1090
Suite 4203            Fax  212-755-1130
New York  NY  10017   Website  www.bialecki.com

Linda Bialecki
President

    -----Original Message-----
    **From:** Marino Marin [mailto:marinpersonal@yahoo.com]
    **Sent:** Friday, July 29, 2005 12:47 AM
    **To:** flane@laneberry.com
    **Cc:** Linda Bialecki
    **Subject:** trip to Boston

    Fred

    Thank you again for your invitation. Leila and I are thrilled to come to see you and your family. Just the idea makes me feel better although I am still not 100% there.

    Sorry for answering only now. I cheked over he last couple of days and probably the best date would be the 27-28 as I am not confident that in 2 weeks I will be fully operational and because it is very tough for me to get flights during the peak season. To be honest apparently also for the 27 is a bit complicated to get flights even in economy unless we get a full fare.

    I am working on it and I will keep you posted.

Thank you

Marino

ps
in the next few weeks I will be reacheable mainly by phone.
My beach house number is + 39 0585 869887
my cells are +39 393 0553825 and +39 335 7483914

---

Start your day with Yahoo! - make it your home page

**EXHIBIT E**

# YAHOO! MAIL

Print - Close Window

**Subject:**  Re: trip to Boston

**Date:**  Tue, 2 Aug 2005 19:48:28 -0400

**From:**  "Lane, Fred" <flane@laneberry.com>

**To:**  linda@bialecki.com, marinpersonal@yahoo.com

**CC:**  "Hines, Stephen" <shines@laneberry.com>

Marino,

We will be ready to have you and your wife visit as soon as you are
ready and able to travel.

Keep us posted on the health of youf back!

All the best,
Fred

Frederick C. Lane
Chairman and Chief Executive Officer
Lane, Berry & Co. International, LLC
100 Federal Street, 33rd Floor
Boston, MA 02110
phone: (617) 624-7070
fax: (617) 742-0874
flane@laneberry.com
www.laneberry.com

---------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Linda Bialecki <linda@bialecki.com>
To: Marino Marin <marinpersonal@yahoo.com>
CC: Hines, Stephen <shines@laneberry.com>; Lane, Fred
<flane@laneberry.com>
Sent: Tue Aug 02 18:21:31 2005
Subject: RE: trip to Boston

Marino,


I spoke to Steve Hines.  He has been expecting to pay for your trip
over here at Lane Berry's invitation.  Also he certainly expects you to
fly business class (especially with your back).


You must take care of your back first, of course.  So they are very
happy to see you when ever it makes most sense for you....as long as they
are not risking loosing you to a competitor.


I told Steve you would have a much better idea after your Thursday

hospital visit.  Steve and all of his brothers have had back operations, so
you are talking to a very sympathetic person.


So health first.  Good luck on Thursday.


Ps.  You probably know from them that LaneBerry is having a banner year
with lots of sell side mandates, with a very large new one signed up
last week.
http://www.laneberry.com/transactions/search.cfm?nav=12&bIsSubmitted=1



Regards, Linda




BIALECKI INC

780 Third Avenue            Office:  212-755-1090

Suite 4203
                            Fax:  212-755-1130
New York, NY  10017    Website:  www.bialecki.com
<http://www.bialecki.com>


Linda Bialecki

President

-----Original Message-----
From: Marino Marin [mailto:marinpersonal@yahoo.com]
Sent: Friday, July 29, 2005 12:47 AM
To: flane@laneberry.com
Cc: Linda Bialecki
Subject: trip to Boston


Fred


Thank you again for your invitation. Leila and I are thrilled to come
to see you and your family. Just the idea makes me feel better although
I am still not 100% there.

Sorry for answering only now. I cheked over he last couple of days and probably the best date would be the 27-28 as I am not confident that in 2 weeks I will be fully operational and because it is very tough for me to get flights during the peak season. To be honest apparently also for the 27 is a bit complicated to get flights even in economy unless we get a full fare.


I am working on it and I will keep you posted.


Thank you


Marino


ps

in the next few weeks I will be reacheable mainly by phone.

My beach house number is + 39 0585 869887

my cells are +39 393 0553825 and +39 335 7483914

---

Start your day with Yahoo! - make it your home page
<http://us.rd.yahoo.com/evt=34442/*http://www.yahoo.com/r/hs>
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
The information contained in this e-mail message, and any attachment thereto, is confidential and may not be disclosed without our express permission. If you are not the intended recipient or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution or copying of this message, or any attachment thereto, in whole or in part, is strictly prohibited. If you have received this message in error, please immediately notify us by telephone, fax or e-mail and delete the message and all of its attachments. Thank you.

Every effort is made to keep our network free from viruses. You should, however, review this e-mail message, as well as any attachment thereto, for viruses. We take no responsibility and have no liability for any computer virus which may be transferred via this e-mail message.

**EXHIBIT F**

# YAHOO! MAIL

Print - Close Window

**Subject:** FW: E-TKT RECEIPT MR MARIN

**Date:** Fri, 16 Sep 2005 10:50:21 -0400

**From:** "Heon, Jacqueline" <Jheon@laneberry.com>

**To:** marinpersonal@yahoo.com

**CC:** "Hines, Stephen" <shines@laneberry.com>

Hi Marino,

Below is your e-ticket. I kept the flight arrangements exactly as you had reserved them. I will forward you a copy of your meeting itinerary/hotel accommodations today or Monday.

Good luck with your surgery! Until then, have a great weekend.

**Jacqueline T. Heon**
Executive Assistant
**Lane, Berry & Co. International, LLC**
100 Federal Street, 33rd Floor
Boston, MA 02110
p: (617)-624-7017
f: (617)-742-0874
jheon@laneberry.com
www.laneberry.com

**From:** Call Center Alitalia ETK [mailto:call.center@alitalia.it]
**Sent:** Friday, September 16, 2005 9:54 AM
**To:** Heon, Jacqueline
**Subject:** E-TKT RECEIPT MR MARIN

ALITALIA
    CF 00476680582 PI 00903301000

    ELECTRONIC TICKET PASSENGER RECEIPT

NAME: MARIN/MARINO

E-MAIL: JHEONLANEBERRY.COM

RESERVATION FILE REFERENCE NUMBER: AZ LD4I3R
ETKT NUMBER: 0552163385122

#MA
FROM/TO                FLIGHT DATE  TIME STATUS CLASS
MILAN          MXP     AZ0618 22SEP 1040  OK    Y
  BOSTON            BOS
                    VOID
NEWARK         EWR     AZ0607 24SEP 2220  OK    J
  MILAN        MXP

DATE AND PLACE OF ISSUE: 16SEP05  AZ   ZNY

FORM OF PAYMENT:  CC AX  XXXXXXXXXX1004

```
FARE:   EUR    3054.00
EQU:    USD    3752.00

#MA
TAX         2.50 AY
TAX        28.20 US
TAX         4.95 XA
TAX         3.00 XF
TAX         7.00 XY
TAX         5.00 YC
TAX         2.54 EX
TAX         2.46 HB
TAX       122.93 FX

TOTAL:  USD    3930.58
```

FARE CALCULATION:
MIL AZ BOS M1471.66YOW8C /-NYC AZ MIL M2276.23JRT NUC3747.89END
#MA
 ROE0.814723 XT 28.20US 4.95XA 3.00XF 7.00XY 5.00YC 2.54E
X 2.46HB122.93FX XF EWR3

CARRIAGE HEREUNDER IS SUBJECT TO THE RULES AND LIMITATIONS

*********************************************************************************

Per accedere alle offerte Alitalia ed al biglietto elettronico, visita il ns. sito
www.alitalia.com

For immediate access to the Alitalia offers and to electronic tickets, visit our website
www.alitalia.com

*********************************************************************************

Per accedere alle offerte Alitalia ed al biglietto elettronico, visita il ns. sito
www.alitalia.com

For immediate access to the Alitalia offers and to electronic tickets, visit our website
www.alitalia.com

-----------------------------------------------------------------------
The information contained in this e-mail message, and any attachment thereto, is confidential and may not be
disclosed without our express permission. If you are not the intended recipient or an employee or agent
responsible for delivering this message to the intended recipient, you are hereby notified that you have received
this message in error and that any review, dissemination, distribution or copying of this message, or any
attachment thereto, in whole or in part, is strictly prohibited. If you have received this message in error, please
immediately notify us by telephone, fax or e-mail and delete the message and all of its attachments. Thank you.

Every effort is made to keep our network free from viruses. You should, however, review this e-mail message,
as well as any attachment thereto, for viruses. We take no responsibility and have no liability for any computer
virus which may be transferred via this e-mail message.

**EXHIBIT G**

# YAHOO! MAIL

Print - Close Window

**Subject:**

**Date:**   Thu, 29 Sep 2005 09:45:04 -0400

**From:**   "Lane, Fred" <flane@laneberry.com>

**To:**   marinpersonal@yahoo.com

Dear Marino,

We are all extremely pleased about the prospect of your joining our Firm as a partner who will help drive our continued growth.

To review our discussions, we propose that you join Lane Berry & Co. as a Managing Director in our Investment Banking business, and that you will be located full-time either in the Boston office or in the New York office. That decision is yours. As a Managing Director, you will be paid a salary of not less than $130,000. As we expect to increase Managing Director salaries at year-end, you will be paid at the same annual salary rate as other Managing Directors in Investment Banking.

Recognizing that you will be relocating from Europe to join the Firm, we are also prepared to offer you a minimum guaranteed bonus for calendar year 2006, payable in January 2007, equal to the amount by which your annualized salary for 2006 is less than $200,000. To be clear on this point, if you join us after January 1, 2006, this minimum guaranteed bonus would be payable only if your annual salary rate is less than $200,000 on an annualized basis. The bonus would also be prorated for the number of months during 2006 you actually worked for Lane Berry. (E.g., if you joined the Firm on April 1, 2006, the minimum guaranteed bonus would be 75% of what it would be had you joined the Firm on January 1, 2006.)

While we have discussed this at some length, I also want to clarify in writing our bonus compensation system for Investment Banking professionals. The attached note addresses how it works. As you can see by the example, cash compensation can be high at a level of revenues from fees which is relatively low relative to the revenue targets per Managing Director at most bulge bracket firms.

We are also prepared to assist you in the process of obtaining a (permanent) work visa and to pay the costs of obtaining such a visa by means of a forgivable loan which will be forgiven if you are with the Firm as of January 31, 2007.

Likewise, we are also prepared to assist you with the costs and expenses involved in relocating to the United States. We propose to provide you a forgivable loan, not to exceed $30,000, 50% of which will be forgiven if you are with the Firm as of January 31, 2007 and 50% of which will be forgiven if you are still with the Firm as of January 31, 2008.

One administrative matter I should call to your attention is your need to have in place current registrations with the National Association of Securities Dealers (NASD) with respect to Series 7 status and Series 63 (state level) status. You can take these exams shortly after your arrival in the U.S., if your registrations are not current. You will also need to be registered as a Series 24 Registered Principal for NASD purposes, if you are not registered already.

We are eager to move along with the process of your joining the Firm, so please feel free to call me or Karen Vernamonti if you have any questions about our proposal. I know that I speak for all of us at Lane Berry in welcoming you to the partnership.

Very truly yours,

**Jacqueline T. Heon**
Executive Assistant
**Lane, Berry & Co. International, LLC**
100 Federal Street, 33rd Floor
Boston, MA 02110
p: (617)-624-7017
f: (617)-742-0874
jheon@laneberry.com
www.laneberry.com

------------------------------------------------------------------

The information contained in this e-mail message, and any attachment thereto, is confidential and may not be disclosed without our express permission. If you are not the intended recipient or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution or copying of this message, or any attachment thereto, in whole or in part, is strictly prohibited. If you have received this message in error, please immediately notify us by telephone, fax or e-mail and delete the message and all of its attachments. Thank you.

Every effort is made to keep our network free from viruses. You should, however, review this e-mail message, as well as any attachment thereto, for viruses. We take no responsibility and have no liability for any computer virus which may be transferred via this e-mail message.

**Attachments**

Files:

    **LBCI___Bonus_System.doc** (34k) [Preview]

## The Lane, Berry & Co.
## Bonus System For Investment Bankers

Gross revenues relating to projects where the banker has had an active involvement is the starting point. On each project, the banker needs to assess his relative contribution, in percentage terms, to the realization of revenues from the engagement.

Contributions relate to 1.) finding the piece of business/the New Business function; 2.) signing up the piece of business/closing on the New Business opportunity; 3.) managing the engagement/managing the client, so as to complete the engagement; and 4.) "grinding", which relates to the execution of the business. These four components generally receive revenue allocation credit in approximately the following percentages:

|          | %      |
|----------|--------|
| Finding  | 15-20% |
| Signing  | 15-20% |
| Managing | 30-35% |
| Grinding | 30-35% |

Remember that Managing Directors, Directors, Vice Presidents, and Associates participate in this bonus pool, although Associates' contributions (generally, 20-25%) are "pooled" in an Associate Bonus Pool.

So, if a Managing Director worked on 4 major projects in a year, here's how his bonus would be determined:

|            | Gross    | %   | Net     | Comments                   |
|------------|----------|-----|---------|----------------------------|
| Project A  | $1.0 MM  | 40% | $400 K  | Shared management role     |
| Project B  | 1.5 MM   | 55% | $825 K  | Leadership role            |
| Project C  | 0.8 MM   | 50% | $400 K  | Leadership role            |
| Project D  | 1.8 MM   | 45% | $855 K  | Director played a large role |
| Other Fees | 0.2 MM   | 50% | $100 K  | None                       |

These net fees aggregate $2,580,000. An overhead factor of 3 times salary is then deducted from net fees. So, assuming a salary of $160,000 (it makes the math easy), $480,000 is deducted from net fees of $2,580,000, leaving $2,100,000. The bonus is then 35% of the "adjusted" net fees, or approximately $800,000 in this example. Total compensation is therefore $960,000, the combination of salary and bonus.

While this example suggests that the bonus system is mechanical, there are some judgments which necessarily need to be made by management of the Firm. However, in our experience, there is unlikely to be much of a spread to professionals at year-end with respect to the actual bonus paid versus expectation.

The above ignores grants of stock in Lane Berry. Such grants are made to key employees in January of each year and are additive to total compensation. These granted shares vest over a four year period.

**EXHIBIT H**

# YAHOO! MAIL

Print - Close Window

**Subject:** RE: Bad news on SLi

**Date:** Wed, 29 Mar 2006 17:25:07 -0500

**From:** "Berry, Bob" <bberry@laneberry.com>

**To:** "Marino Marin" <marinpersonal@yahoo.com>

Great.

Robert M. Berry
President
Lane, Berry & Co. International, LLC
100 Federal Street, 33rd Floor
Boston, MA 02110
phone: (617) 624-7007
fax: (617) 742-0874
bberry@laneberry.com

---

**From:** Marino Marin [mailto:marinpersonal@yahoo.com]
**Sent:** Wednesday, March 29, 2006 5:21 PM
**To:** Berry, Bob
**Subject:** RE: Bad news on SLi

ok. I know that Rhone Capital wants us to get the book for them. Also CVC might. This is a start.

Lets discuss, if ok for you, on monday when i am in the office.

*" Berry , Bob " <bberry@laneberry.com> wrote:*

Marino:
There is no chance of getting a co-advisory role here so we should go ahead and figure out the best horse to ride on the buy side.
Best Regards
Bob

Robert M. Berry
President
Lane, Berry & Co. International, LLC
100 Federal Street , 33rd Floor
Boston , MA 02110
phone: (617) 624-7007
fax: (617) 742-0874
bberry@laneberry.com

---

**From:** Marino Marin [mailto:marinpersonal@yahoo.com]
**Sent:** Saturday, March 25, 2006 2:27 AM
**To:** Lane, Fred ; Berry, Bob
**Subject:** Re: Bad news on SLi

Thank you Fred.

Bob and I already arranged to meet with the Cerberus guys (Brodie and Wolf) in April in NY. We will give them the opportunity to redeem themself.

*" Lane, Fred " <flane@laneberry.com> wrote:*

I don't think you guys should feel badly as it was an uphill battle. And it positions us to get other equally attractive business from DDJ.

Marino and Bob, let's be sure to call Brody and others at Cerberus and tell them we forgive them if they have another larger engagement for us!

Fred


Frederick C. Lane
Chairman and Chief Executive Officer
Lane, Berry & Co. International, LLC
100 Federal Street , 33rd Floor
Boston , MA 02110
Phone: (617)-624-7070 Fax:  (617)-742-0874
email:  flane@laneberry.com
www.laneberry.com


-----Original Message-----
From: Berry, Bob
To: 'Marino Marin'
Sent: Fri Mar 24 14:14:33 2006
Subject: Bad news on SLi

Marino:
David spoke with DDJ today; they've given the business to Rothschild ( London team with assistance from their Frankfurt group). Call me or David in Boston for more color.

Bob



Robert M. Berry

President

Lane, Berry & Co. International, LLC

100 Federal Street , 33rd Floor

Boston , MA 02110

phone: (617) 624-7007

fax: (617) 742-0874

bberry@laneberry.com


------------------------------------------------------------------------
The information contained in this e-mail message, and any attachment thereto, is

confidential and may not be disclosed without our express permission. If you are not the intended recipient or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution or copying of this message, or any attachment thereto, in whole or in part, is strictly prohibited. If you have received this message in error, please immediately notify us by telephone, fax or e-mail and delete the message and all of its attachments. Thank you.

Every effort is made to keep our network free from viruses. You should, however, review this e-mail message, as well as any attachment thereto, for viruses. We take no responsibility and have no liability for any computer virus which may be transferred via this e-mail message.

---

Yahoo! Messenger with Voice. Make PC-to-Phone Calls to the US (and 30+ countries) for 2¢/min or less.
--------------------------------------------------------------------------
The information contained in this e-mail message, and any attachment thereto, is confidential and may not be disclosed without our express permission. If you are not the intended recipient or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution or copying of this message, or any attachment thereto, in whole or in part, is strictly prohibited. If you have received this message in error, please immediately notify us by telephone, fax or e-mail and delete the message and all of its attachments. Thank you.

Every effort is made to keep our network free from viruses. You should, however, review this e-mail message, as well as any attachment thereto, for viruses. We take no responsibility and have no liability for any computer virus which may be transferred via this e-mail message.

---

New Yahoo! Messenger with Voice. Call regular phones from your PC for low, low rates.
--------------------------------------------------------------------------
The information contained in this e-mail message, and any attachment thereto, is confidential and may not be disclosed without our express permission. If you are not the intended recipient or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution or copying of this message, or any attachment thereto, in whole or in part, is strictly prohibited. If you have received this message in error, please immediately notify us by telephone, fax or e-mail and delete the message and all of its attachments. Thank you.

Every effort is made to keep our network free from viruses. You should, however, review this e-mail message, as well as any attachment thereto, for viruses. We take no responsibility and have no liability for any computer virus which may be transferred via this e-mail message.

# YAHOO! MAIL

Print - Close Window

**Subject:** RE: FW: Adam Aircraft

**Date:** Wed, 29 Mar 2006 09:42:45 -0500

**From:** "DelPorto, Jeff" <jdelporto@laneberry.com>

**To:** "Marino Marin" <marinpersonal@yahoo.com>

No problem – enjoy your packing!!

---

**From:** Marino Marin [mailto: marinpersonal@yahoo.com ]
**Sent:** Wednesday, March 29, 2006 9:38 AM
**To:** DelPorto, Jeff
**Subject:** RE: FW: Adam Aircraft

Hi

In NY.

I am packing right now and it is complicated for me to colect my thoughts properly in the middle of the move.

Can we wait until monday? This way I can also get a better understanding from you on the nouances of this company and shareholders. If not feel free to call me at 011 39 02 454 88 177.

Regards

*" DelPorto, Jeff " <jdelporto@laneberry.com>* wrote:

Marino – will you be in New York or Boston ?

Also, any preliminary investor ideas would be greatly appreciated.

Thanks

Jeff

---

**From:** Marino Marin [mailto: marinpersonal@yahoo.com ]
**Sent:** Tuesday, March 28, 2006 6:06 PM
**To:** DelPorto, Jeff
**Subject:** Re: FW: Adam Aircraft

Hi Jeff
I will be in the office on April 3. I will be delighted to help. Yes we can speak to bridgepoint and various others. If timing is fine for you we could touch base on monday.
Thanks

*" DelPorto, Jeff " <jdelporto@laneberry.com>* wrote:

Marino:

http://us.f340.mail.yahoo.com/ym/ShowLetter?box=boston&MsgId=7953_0_3208_1404...    12/21/2006

Tim and I are in the process of raising growth capital for Adam Aircraft – see description below. I was in the process of reaching out to some European investors like Bridgepoint Capital and thought it might make sense to touch base with you on any potential ideas for European investment sources. I have attached the presentation for your review as well. Any investor (including high net worth individuals or families – like Branson) ideas you could offer would be greatly appreciated.

Thanks

Jeff

Adam Aircraft designs and manufactures innovative, high performance general aviation aircraft for commercial and government markets. It is the leader in the development of Very Light Jets ("VLJs")  VLJs are small jet aircraft, seating 3-10 passengers and are typically priced between $1.5 and $3.0 million.

Currently, Adam Aircraft offers two aircraft models:

➢ A500 - pressurized, twin-engine aircraft, FAA approved, 2 units delivered to date (61 units in backlog) , first all-new, multi-engine piston certified in over 25 years
➢ A700 - AdamJet VLJ, FAA approval expected by end of FY 2006 (297 units in backlog) delivers jet performance at a fraction of the cost of traditional solutions

The FAA predicts that the VLJ market will grow from $250 million in 2006 to over $3 billion by 2010.  Fractional owners, charter operators, corporations and high net worth individuals are the primary target buyers for the AdamJet.

To date, the Company has raised capital from prominent lead investors including Goldman Sachs Hunt Investment, Tinicum and GH Venture to fund product development and operations of Adam Aircraft. At present, the Company is seeking to raise $50 - $60 million of new capital to fund production of the A500, development of the A700 and to bring its operations to sustainable profitability.

In addition to the attached presentation, please visit the Company's website at www.adamaircraft.com.

*Jeff*

**Jeffrey M. DelPorto**
Managing Director
**Lane, Berry & Co. International, LLC**

660 Madison Avenue , 14th Floor
New York , NY  10021
p:  (212) 224-8507
f:  (212) 224-8501
c:  (201) 317-4734
jdelporto@laneberry.com
www.laneberry.com

----------------------------------------------------------------------
The information contained in this e-mail message, and any attachment thereto, is confidential and may not be disclosed without our express permission. If you are not the intended recipient or an employee or agent responsible for delivering this message

to the intended recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution or copying of this message, or any attachment thereto, in whole or in part, is strictly prohibited. If you have received this message in error, please immediately notify us by telephone, fax or e-mail and delete the message and all of its attachments. Thank you.

Every effort is made to keep our network free from viruses. You should, however, review this e-mail message, as well as any attachment thereto, for viruses. We take no responsibility and have no liability for any computer virus which may be transferred via this e-mail message.

---

New Yahoo! Messenger with Voice. Call regular phones from your PC for low, low rates.

---

The information contained in this e-mail message, and any attachment thereto, is confidential and may not be disclosed without our express permission. If you are not the intended recipient or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution or copying of this message, or any attachment thereto, in whole or in part, is strictly prohibited. If you have received this message in error, please immediately notify us by telephone, fax or e-mail and delete the message and all of its attachments. Thank you.

Every effort is made to keep our network free from viruses. You should, however, review this e-mail message, as well as any attachment thereto, for viruses. We take no responsibility and have no liability for any computer virus which may be transferred via this e-mail message.

---

Yahoo! Messenger with Voice. PC-to-Phone calls for ridiculously low rates.

---

The information contained in this e-mail message, and any attachment thereto, is confidential and may not be disclosed without our express permission. If you are not the intended recipient or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution or copying of this message, or any attachment thereto, in whole or in part, is strictly prohibited. If you have received this message in error, please immediately notify us by telephone, fax or e-mail and delete the message and all of its attachments. Thank you.

Every effort is made to keep our network free from viruses. You should, however, review this e-mail message, as well as any attachment thereto, for viruses. We take no responsibility and have no liability for any computer virus which may be transferred via this e-mail message.

# YAHOO! MAIL

Print - Close Window

**Subject:** RE: Buyer Expertise Materials

**Date:** Sat, 18 Mar 2006 14:38:14 -0500

**From:** "Clark, David" <dclark@laneberry.com>

**To:** "Fairweather, Daniel" <dfairweather@laneberry.com>, marinpersonal@yahoo.com

**CC:** "Berry, Bob" <bberry@laneberry.com>, "DelPorto, Jeff" <jdelporto@laneberry.com>, "Katz, Jonathan" <jkatz@laneberry.com>

All,

Attached are my initial comments to the presentation.  I added a lead in slide that previews the pages to follow.  Let me know if you have any questions.

David

---

From: Fairweather, Daniel
Sent: Fri 3/17/2006 6:55 PM
To: 'marinpersonal@yahoo.com'
Cc: Berry, Bob; DelPorto, Jeff; Clark, David; Katz, Jonathan
Subject: Buyer Expertise Materials

Marino,

Attached please find a draft of the buyer expertise follow up materials for SLi.  Feel to free follow up over the weekend or on Monday to discuss.  Our goal is to send something out to DDJ, Cerberus, and SLi management early next week.

On another note, Bob wanted to set up a meeting between you and one of our clients, The Stride Rite Corporation, to discuss your knowledge of Fila's business, which they have indicated an interest in.  You may remember that we advised Stride Rite on its recent acquisition of Saucony.  Stride Rite is headquartered in Lexington, MA, so perhaps we can set up a meeting shortly after your arrival in April.  Please let us know your thoughts.

Regards,
Dan

Daniel P. Fairweather

Associate

Lane, Berry & Co. International, LLC

100 Federal Street, 33rd Floor

Boston, MA 02110

p: (617)-624-7030

f:  (617)-742-0876

dfairweather@laneberry.com <mailto:dfairweather@laneberry.com>

www.laneberry.com <http://www.laneberry.com/>

-----------------------------------------------------------------------
The information contained in this e-mail message, and any attachment
thereto, is confidential and may not be disclosed without our express
permission. If you are not the intended recipient or an employee or agent
responsible for delivering this message to the intended recipient, you
are hereby notified that you have received this message in error and
that any review, dissemination, distribution or copying of this message,
or any attachment thereto, in whole or in part, is strictly prohibited.
If you have received this message in error, please immediately notify
us by telephone, fax or e-mail and delete the message and all of its
attachments. Thank you.

Every effort is made to keep our network free from viruses. You should,
however, review this e-mail message, as well as any attachment thereto,
for viruses. We take no responsibility and have no liability for any
computer virus which may be transferred via this e-mail message.

## Attachments

Files:

  SLi_Buyer_Pages___Comments.pdf (3.5MB)

# YAHOO! MAIL

Print - Close Window

**Subject:** Potential Sell-Side Mandate for Lane Berry

**Date:** Fri, 23 Dec 2005 14:54:00 -0500

**From:** "Clark, David" <dclark@laneberry.com>

**To:** marinpersonal@yahoo.com

Marino,

Fred and Bob suggested I contact you regarding a European business that we are pitching for the sell-side mandate. The company is called Sylvania Lighting International which is owned by DDJ Capital (see attached teaser). DDJ plans to sell the General Lighting business that produces and sells light bulbs and fixtures primarily to European customers (70%-80% of revenues) as well as into Latin America. I'm not sure the exact size of the General Lighting business but I believe it makes up about 50% of SLI's total revenues is about $750 million. The General Lighting business is headquartered in Frankfurt and given its European customer base we thought you might have some ideas as to who would be interested buyers, both strategic and financial. In addition, any other thoughts would be appreciated.

Thanks and have a wonderful Holiday !!!

David

**David T. Clark**
Director
**Lane, Berry & Co. International, LLC**
100 Federal Street, 33rd Floor
Boston, MA 02110
p: (617) 624-7006
f: (617) 742-0876
dclark@laneberry.com
www.laneberry.com

---------------------------------------------------------------

The information contained in this e-mail message, and any attachment thereto, is confidential and may not be disclosed without our express permission. If you are not the intended recipient or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution or copying of this message, or any attachment thereto, in whole or in part, is strictly prohibited. If you have received this message in error, please immediately notify us by telephone, fax or e-mail and delete the message and all of its attachments. Thank you.

Every effort is made to keep our network free from viruses. You should, however, review this e-mail message, as well as any attachment thereto, for viruses. We take no responsibility and have no liability for any computer virus which may be transferred via this e-mail message.

**Attachments**

Files:

📎 **SLI.ppt** (434k)

Yahoo! Mail - marinpersonal@yahoo.com   Page 1 of 1

# YAHOO! MAIL

Print - Close Window

**Subject:** Greetings

**Date:** Mon, 30 Jan 2006 15:32:57 -0500

**From:** "Berry, Bob" <bberry@laneberry.com>

**To:** marinpersonal@yahoo.com

Marino:

Happy New Year.  I trust that all is well.  Thank you for the insight that you provided David on the Lighting Business that is owned by a client of our firm.  I look forward to pitching that potential piece of business with you soon.  Also, would you happen to know a company in Italy called Bouty SA?  Established in 1898, Bouty SpA is an Italian pharmaceutical company with three core businesses: non-prescription drugs and generic pharmaceutical products; diagnostics systems; and transdermal patches for the sustained release of drugs.  A client asked if we knew the company or its private equity owners: Centrobanca and Kairos Partners.

Best Regards
Bob

**Robert M. Berry**
President
Lane, Berry & Co. International, LLC
100 Federal Street, 33rd Floor
Boston, MA 02110
phone: (617) 624-7007
fax: (617) 742-0874
bberry@laneberry.com

------------------------------------------------------------------------

The information contained in this e-mail message, and any attachment thereto, is confidential and may not be disclosed without our express permission. If you are not the intended recipient or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution or copying of this message, or any attachment thereto, in whole or in part, is strictly prohibited. If you have received this message in error, please immediately notify us by telephone, fax or e-mail and delete the message and all of its attachments. Thank you.

Every effort is made to keep our network free from viruses. You should, however, review this e-mail message, as well as any attachment thereto, for viruses. We take no responsibility and have no liability for any computer virus which may be transferred via this e-mail message.

# YAHOO! MAIL

Print - Close Window

**Subject:** FW: Fila
**Date:** Tue, 21 Mar 2006 09:29:32 -0500
**From:** "Lane, Fred" <flane@laneberry.com>
**To:** "Marino Marin" <marinpersonal@yahoo.com>
**CC:** "Berry, Bob" <bberry@laneberry.com>

Marino,

I want you to know how much we are all looking forward to your arrival at Lane Berry. I have been thinking about various areas where you might want to focus and accumulating materials for discussion when we get together.

Feel free to call me or Bob if you want to discuss any potential business opportunities as we want be as supportive as possible.

All the best,
Fred

**Frederick C. Lane**
Chairman and Chief Executive Officer
**Lane, Berry & Co. International, LLC**
100 Federal Street, 33rd Floor
Boston, MA 02110
Phone: (617) 624-7070.Fax: (617) 742-0874
email: flane@laneberry.com
www.laneberry.com

---

**From:** Berry, Bob
**Sent:** Tuesday, March 21, 2006 9:05 AM
**To:** Lane, Fred
**Subject:** FW: Fila

**Robert M. Berry**
President
Lane, Berry & Co. International, LLC
100 Federal Street, 33rd Floor
Boston, MA 02110
phone: (617) 624-7007
fax: (617) 742-0874
bberry@laneberry.com

---

**From:** Marino Marin [mailto:marinpersonal@yahoo.com]
**Sent:** Saturday, March 18, 2006 5:53 AM
**To:** Berry, Bob
**Subject:** Fila

Hi Bob

Let me know at your convenience when can we have a brief chat about Fila. I would like to share with you some info.

On Sunday I will be out but I am available today Saturday anytime until 2pm EST: if I am out call me on cell phone (+39 393 055 3825) and I will get back home to talk to you; or on Monday pm for you

(after 1pm EST).

Best
Marino

Home +390245488177


*" Fairweather, Daniel " <dfairweather@laneberry.com>* wrote:

On another note, Bob wanted to set up a meeting between you and one of our clients, The Stride Rite Corporation, to discuss your knowledge of Fila's business, which they have indicated an interest in. You may remember that we advised Stride Rite on its recent acquisition of Saucony. Stride Rite is headquartered in Lexington , MA , so perhaps we can set up a meeting shortly after your arrival in April. Please let us know your thoughts.

Regards,
Dan

**Daniel P. Fairweather**
Associate
**Lane, Berry & Co. International, LLC**
100 Federal Street, 33rd Floor
Boston, MA 02110
p: (617)-624-7030
f: (617)-742-0876
dfairweather@laneberry.com
www.laneberry.com

------------------------------------------------------------------------
The information contained in this e-mail message, and any attachment thereto, is confidential and may not be disclosed without our express permission. If you are not the intended recipient or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution or copying of this message, or any attachment thereto, in whole or in part, is strictly prohibited. If you have received this message in error, please immediately notify us by telephone, fax or e-mail and delete the message and all of its attachments. Thank you.

Every effort is made to keep our network free from viruses. You should, however, review this e-mail message, as well as any attachment thereto, for viruses. We take no responsibility and have no liability for any computer virus which may be transferred via this e-mail message.

<hr size=1 width="100%" align=center>
Yahoo! Travel
Find great deals to the top 10 hottest destinations!
------------------------------------------------------------------
The information contained in this e-mail message, and any attachment thereto, is confidential and may not be disclosed without our express permission. If you are not the intended recipient or an employee or agent

Page 3 of 3

responsible for delivering this message to the intended recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution or copying of this message, or any attachment thereto, in whole or in part, is strictly prohibited. If you have received this message in error, please immediately notify us by telephone, fax or e-mail and delete the message and all of its attachments. Thank you.

Every effort is made to keep our network free from viruses. You should, however, review this e-mail message, as well as any attachment thereto, for viruses. We take no responsibility and have no liability for any computer virus which may be transferred via this e-mail message.

**EXHIBIT I**

# Lane Berry
INVESTMENT BANKING

Lane, Berry & Co. International, LLC
100 Federal Street, 33rd Floor
Boston, MA 02110
(617) 624-7070

FREDERICK C. LANE
Chairman & CEO

November 16, 2005

Paul Novak, Director
Vermont Service Center
Citizenship and Immigration Services
St. Albans, Vermont

RE:   Marino Marin

Dear Director Novak:

Lane, Berry & Co. International, LLC (Lane Berry) has offered the Managing Director position with our firm to Marino Marin and petitions for O-1 status for Mr. Marin as an alien with extraordinary ability in the field of business. Mr. Marin is at the top of the field in investment banking and Lane, Berry is very pleased he will be joining our firm.

## Lane, Berry & Co. International, LLC

I founded Lane Berry in January 2002 along with my partner, Robert Berry. Mr. Berry and I were Managing Directors at Donaldson, Lufkin & Jenrette, a prestigious investment bank devoted to high quality investment banking, for many years. As industry consolidation led to the demise of Wall Street's traditional independent firms including DLJ; Kidder Peabody; Salomon Brothers; Montgomery Securities; Alex Brown and others, we saw clearly a unique opportunity to build a new, decidedly independent, national investment banking firm.

At Lane Berry we believe in traditional investment banking, long-term client relationships and success. Our senior bankers choose to advise clients with hands-on involvement in a highly entrepreneurial culture free from conflicts inherent in acting as lender, investment research source, investment and merchant banker. Objectivity and independence are essential to the value of our advice to clients. Lane Berry clients count on our experience, expertise, our partnership and our passionate commitment to helping them meet their growth objectives.

Materials about this firm accompany the petition.

## Marino Marin

Mr. Marin is clearly an extraordinary investment banker. His resume alone announces him as one at the very top of his field having held critical positions with such eminent firms as Rothschild, Lehman Brothers and currently with UniCredit Banca Mobilarie in Milan. The

letters submitted in support of Mr. Marin are from individuals whose superiority and prestige are without question. The letters are from the worlds of academia (Professors Norman and La Malfa), the political/economic world (La Malfa, the Italian Minister for European Affairs), and the world of finance (Robert Agostinelli and Joshua Cammaker). I shall not repeat the accolades - with which I am in full agreement – eloquently stated by these individuals. I should report that we have hired Mr. Marin into the Managing Director position at an annual base salary of $185,000 with panoply of benefits and with expectation that his remuneration will easily be One Million Dollars or more annually.  His sterling reputation, record of extraordinary achievements, and Lane Berry's expectations render such remuneration a given.

    In consideration of the above and the attached, I herewith request approval of Lane Berry's O-1 Petition.

                                                    Yours truly,

                                                    Frederick C. Lane

**EXHIBIT J**

# YAHOO! MAIL

Print - Close Window

**Subject:** RE:

**Date:** Thu, 22 Dec 2005 18:17:27 -0500

**From:** "Lane, Fred" <flane@laneberry.com>

**To:** "Marino Marin" <marinpersonal@yahoo.com>

Merry Christmas and Happy New Year to you and your family.

We are looking forward to your "arrival".

All the best,
Fred

**Frederick C. Lane**
Chairman and Chief Executive Officer
**Lane, Berry & Co. International, LLC**
100 Federal Street, 33rd Floor
Boston, MA 02110
Phone: (617) 624-7070. Fax: (617) 742-0874
email: flane@laneberry.com
www.laneberry.com

---

**From:** Marino Marin [mailto:marinpersonal@yahoo.com]
**Sent:** Thursday, December 22, 2005 2:36 PM
**To:** Lane, Fred
**Subject:**

Dear Fred,

I hope this message finds you doing well.

I just wanted to wish you and your family a merry Christmas and a very happy new year!

Please also extend my best wishes also to my new family at LaneBerry. As you know we had a great time with the Hines last month: Leila and I enjoyed very much the evening we spent with them.

I will be in NY at the end of January for the closing of our new house in Greenwich and while I am there I will connnect with the old and the new partners (Jill, wow!) in NY.

All the best,

Marino

PS

I have a couple of new mandates that I would like to bring to the Firm.  When appropriate, I would like to discuss with you if it make any sense in your view to have LaneBerry engaged. I prepared relevant IBCC-like memos regarding a buy side and a sell side that, if you want, I can send you when you have time.

In brief, the sale side refers to an upscale marina in the northern mediterrean sea (close to Portofino and the French riviera) equipped with 200 apartments and 900 berths. The total expected consideration is

about Euro 100-120 million and I would like to ask a success fee of Euro 1 million and a deductible monthly retainer of Euro 25k plus expenses. The client knows I will be joining you and apparently he is ok with it. The fees are to be discussed yet, but I do not envisage particular problems. I will start working on it without signed mandate and no contribution of resources from the bank. Potential buyers are strategic players and real estate private equity funds. The good news here is that in real estate one could run a sale side with limited proximity to the asset.

The buy side regards an add-on acquisition for a PE fund based in NY (Rhone Capital). I recently sold to them leading european yacht company (comparable in car terms to BMW) and they asked me to help on the add on acquisition(s). The first target is Nautor (based in Finland , but owned by Ferragamo) comparable in car terms to Rolls Royce. The consideration is small (maybe Euro 30-40 million), but, given that I have a proprietary angle, I would like to ask for a flat fee of Euro 800k (or $1 million) with a drop dead of Euro 200k ($250,000) which includes expenses. The success fee could be rounded upward if we help on the equity/debt financing.

Yahoo! for Good - Make a difference this year.

The information contained in this e-mail message, and any attachment thereto, is confidential and may not be disclosed without our express permission. If you are not the intended recipient or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution or copying of this message, or any attachment thereto, in whole or in part, is strictly prohibited. If you have received this message in error, please immediately notify us by telephone, fax or e-mail and delete the message and all of its attachments. Thank you.

Every effort is made to keep our network free from viruses. You should, however, review this e-mail message, as well as any attachment thereto, for viruses. We take no responsibility and have no liability for any computer virus which may be transferred via this e-mail message.

**EXHIBIT K**

# PROJECTED FINANCIAL RESULTS

The following provides summary projected financial results for fiscal years ended December 31, 2004 2005, 2006, 2007, 2008 and 2009. Projections are based on assumptions at the date of this Memorandum. Actual results may differ materially from these projections.

| $000s | Forecast FYE 2004 | Projected Fiscal Year Ending Dec. 31, | | | | | 2004-2009 CAGR |
|---|---|---|---|---|---|---|---|
| | | 2005 | 2006 | 2007 | 2008 | 2009 | |
| **STATEMENT OF INCOME DATA:** | | | | | | | |
| Total Revenues | $3,965 | $11,448 | $19,125 | $33,896 | $45,962 | $60,685 | 72.6% |
| % Change | 15.9% | 188.7% | 67.1% | 77.2% | 35.6% | 32.0% | |
| Compensation and Benefits (1) | 3,202 | 7,421 | 12,638 | 19,288 | 25,242 | 33,054 | 59.5% |
| % Total Revenues | 80.7% | 64.8% | 66.1% | 56.9% | 54.9% | 54.5% | |
| Other Expenses | 1,746 | 3,289 | 5,343 | 7,370 | 9,400 | 12,890 | |
| Income Before Tax (1) | (983) | 738 | 1,144 | 7,238 | 11,320 | 14,741 | |
| **BALANCE SHEET DATA:** | | | | | | | |
| Total Assets | $2,285 | $10,452 | $11,399 | $15,788 | $22,636 | $31,548 | |
| Total Liabilities | 1,055 | 780 | 1,040 | 1,086 | 1,142 | 1,209 | |
| Members' Equity (2) | 1,230 | 9,672 | 10,359 | 14,702 | 21,494 | 30,339 | |
| **SELECTED DATA AND RATIOS:** | | | | | | | |
| Senior Bankers w/1 year service (3) | 7 | 9 | 17 | 25 | 33 | 44 | 44.4% |
| Total Bankers | 15 | 31 | 45 | 59 | 76 | 93 | |
| Revenues/Senior Banker w/1 yr. | $566 | $1,431 | $1,125 | $1,356 | $1,393 | $1,379 | |
| Revenues/Total Bankers | 264 | 369 | 425 | 575 | 605 | 653 | |

(1) Pro Forma to reflect inclusion of Mr. Lane's and Mr. Berry's salaries as compensation versus distributions in 2004.
(2) Members' Equity as of December 31, 2004 may include a portion of the balance in the form of subordinated debt.
(3) Senior Bankers includes Managing Directors and Directors.

### *Our Growth Initiative*

We believe long-term, sustainable success in our business requires a national footprint and a critical mass of professional investment bankers and staff. Scale is expected to help even out some of the volatility that is inherent with success fee generation.

We have thoughtfully decided to embark on a strategic growth initiative that would double the size of our organization next year from 22 employees to 39 by year-end 2005. We have retained a prominent executive search firm in order to aid us in adding new professionals to our Firm.

While we believe there to be a good selection of talented senior banking professionals interested in returning to an entrepreneurial partnership culture that Lane Berry offers and we have retained an executive search firm to assist us with the identification and selection processes, there can be no guarantee that we will be successful in executing our hiring plans. We may change the selection of the cities in which to open branch offices as a result of talent being available in other locations. Further, we may add additional offices as opportunities may present.

Lane Berry

Lane Berry Holdings, LLC

Private Placement Memorandum
December 2004

### Employees and Compensation Expense

| $000s | | Projected Fiscal Year Ending December 31, | | | | |
|---|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
| **Employees** | | | | | | |
| Boston | 22 | 26 | 31 | 36 | 42 | 48 |
| Denver | - | 6 | 6 | 6 | 6 | 6 |
| New York City | - | 7 | 13 | 19 | 26 | 33 |
| Los Angeles | - | - | 6 | 12 | 19 | 26 |
| **Total Employees** | 22 | 39 | 56 | 73 | 93 | 113 |
| *Net Increase* | | *17* | *17* | *17* | *20* | *20* |
| *% Growth* | | *77.3%* | *43.5%* | *30.4%* | *27.4%* | *21.5%* |
| **Compensation Expense** (1) | **$3,202** | **$7,421** | **$12,638** | **$19,288** | **$25,242** | **$33,054** |
| *% Revenues* | *80.7%* | *64.8%* | *66.1%* | *56.9%* | *54.9%* | *54.5%* |

(1)   Pro Forma to reflect inclusion of Mr. Lane's and Mr. Berry's salaries as compensation versus distributions in 2004.

Our projections and forecasts include a rolling 12 month period, beginning with a newly-hired investment banker's date of hire, during which we do not expect productivity from him or her. This productivity "grace" period provides a necessary time for an investment banker to reconnect with his/her present client list, introduce the capabilities of Lane Berry and seek new business.

Market practice requires us to compensate new investment bankers with bonus awards during their first year of employment as if they were productive during this period, even if they are not. We will, in essence, "carry" these professionals during their grace period which will have a negative impact on compensation payout as a percentage of revenue generated and is projected to result in an operating loss in 2004 and in modest to break-even profitability for the Firm in fiscal years 2005 and 2006, the years with the most hiring. Once we have established a larger scale, the "carry" for additional investment banking teams per year become less of a burden, and profitability improves each year commencing with 2007 through 2009.

Once an investment banker's grace period expires they will be expected to achieve modest productivity levels relative to our industry generally. We are forecasting managing directors and directors with 12 months of employment with Lane Berry to generate approximately $1.4 million of advisory revenue per year, which never exceeds $700,000 per total banker employed. These levels are conservative compared to productivity levels achieved by industry participants.

### Non-Compensation Operating Expenses

Non-compensation operating expenses represent a relatively smaller portion of total expenses. Higher costs associated with our expansion initiative will be borne in occupancy and equipment, travel and entertainment and professional fees.

| $000s | | Projected Fiscal Year Ending December 31, | | | | |
|---|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
| **Non-Comp. Operating Expenses** | | | | | | |
| Occupancy & Equipment | $729 | $953 | $1,612 | $2,386 | $3,012 | $5,178 |
| Technology & Communications | 223 | 340 | 525 | 633 | 750 | 866 |
| Business Promotion | 419 | 1,513 | 2,587 | 3,636 | 4,808 | 5,983 |
| Professional Fees | 212 | 240 | 346 | 415 | 500 | 516 |
| Other | 164 | 243 | 273 | 300 | 330 | 347 |
| **Total Non-Comp. Op. Expenses** | **$1,746** | **$3,289** | **$5,343** | **$7,370** | **$9,400** | **$12,890** |

Lane Berry

Lane Berry Holdings, LLC

Expenses also increase commensurately with growth in staff and space as both are projected to double in 2005 over 2004 projected levels. The largest expense growth is projected to occur in our business promotion efforts as new bankers embark on aggressive travel schedules.

### Revenue Generation

Advisory fees related to merger and advisory services will continue to generate the majority of revenue over the period. With our expanded NASD membership, we have forecasted moderate revenue generation from underwriting activity commencing in 2005. We have forecasted participation as a co-manager of a variety of products including IPOs, secondary offerings, high grade and high yield debt offerings.

| $000s | Projected Fiscal Year Ending December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
| Advisory Fees | $3,960 | $10,688 | $17,812 | $30,637 | $40,612 | $52,487 |
| Underwriting & Other | 5 | 760 | 1,313 | 3,259 | 5,350 | 8,198 |
| **Total Revenues** | **$3,965** | **$11,448** | **$19,125** | **$33,896** | **$45,962** | **$60,685** |
| *% Growth* | | *188.7%* | *67.1%* | *77.2%* | *35.6%* | *32.0%* |
| Senior Bankers w/1 year service | 7 | 9 | 17 | 25 | 33 | 44 |
| Total Bankers | 15 | 31 | 45 | 59 | 76 | 93 |
| Revenues/Senior Banker w/1 yr. | $566 | $1,431 | $1,125 | $1,356 | $1,393 | $1,379 |
| Revenues/Total Bankers | 264 | 369 | 425 | 575 | 605 | 653 |
| # Underwritings Transactions | - | 2 | 4 | 7 | 9 | 15 |
| Average Underwriting Fee | - | $361 | $318 | $460 | $590 | $544 |

### Revenue and Profitability by Branch Location

| $000s | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
| --- | --- | --- | --- | --- | --- | --- |
| **Advisory Fee Revenues** | | | | | | |
| Boston | $3,960 | $9,738 | $12,112 | $14,487 | $16,387 | $19,237 |
| Denver | - | 950 | 3,800 | 4,750 | 4,750 | 4,750 |
| New York | - | - | 1,900 | 8,075 | 12,113 | 16,625 |
| Los Angeles | - | - | - | 3,325 | 7,362 | 11,875 |
| **Total** | **$3,960** | **$10,688** | **$17,812** | **$30,637** | **$40,612** | **$52,487** |
| Underwriting & Other | 5 | 760 | 1,313 | 3,259 | 5,350 | 8,198 |
| **Total Revenues** | **$3,965** | **$11,448** | **$19,125** | **$33,896** | **$45,962** | **$60,685** |
| **Income Before Tax** | | | | | | |
| Boston (1) | $(983) | $2,224 | $3,304 | $3,977 | $5,979 | $8,056 |
| Denver | - | (547) | 1,473 | 2,087 | 2,027 | 1,948 |
| New York | - | (939) | (1,634) | 1,392 | 2,617 | 3,306 |
| Los Angeles | - | - | (1,999) | (218) | 697 | 1,431 |
| **Income Before Tax (1)** | **$(983)** | **$738** | **$1,144** | **$7,238** | **$11,320** | **$14,741** |

(1)   Pro Forma to reflect inclusion of Mr. Lane's and Mr. Berry's salaries as compensation versus distributions in 2004.

New branch offices typically reach break-even profitability after six quarters of operation and begin to provide a return on capital within another three quarters. Start-up costs for the larger branch offices in Los Angeles and New York City is projected to be roughly between $2.2 and $2.5 million depending upon how quickly professionals are added.

Lane Berry

**EXHIBIT L**

# YAHOO! MAIL

Print - Close Window

**Subject:**  start date

**Date:**  Mon, 13 Mar 2006 17:02:48 -0500

**From:**  "Vernamonti, Karen" <Kvernamonti@laneberry.com>

**To:**  "Marino Marin" <marinpersonal@yahoo.com>

Hi Marino,

Wondering if you have a start-date in mind?

Best,

K

**Karen Vernamonti**
Chief Financial Officer
**Lane, Berry & Co. International, LLC**
100 Federal Street 33rd Floor, Boston , MA  02110
617.624.7082 Tel                    617.742.0874 Fax
kvernamonti@laneberry.com
www.laneberry.com

-----------------------------------------------------------------------

The information contained in this e-mail message, and any attachment thereto, is confidential and may not be disclosed without our express permission. If you are not the intended recipient or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution or copying of this message, or any attachment thereto, in whole or in part, is strictly prohibited. If you have received this message in error, please immediately notify us by telephone, fax or e-mail and delete the message and all of its attachments. Thank you.

Every effort is made to keep our network free from viruses. You should, however, review this e-mail message, as well as any attachment thereto, for viruses. We take no responsibility and have no liability for any computer virus which may be transferred via this e-mail message.

Web CRD - Registrations Summary With Current Empl... [User Name...          https://crd.nasd.com/ipm/vi/crd_ipm_vii_CurrentRegistrations.aspx?...

## Registrations with Current Employers

Individual CRD#: <u>2790923</u>          Individual Name: **MARIN, MARINO**
Firm CRD # : <u>121221</u>          Firm Name : **LANE, BERRY & CO. INTERNATIONAL, LLC**

**Employment Start Date**

                                                                04/03/2006

| Regulatory Authority | Registration Category | Filing Date | Status Date | Registration Status | Approval Date |
|---|---|---|---|---|---|
| NASD | GP | 04/10/2006 | 10/09/2006 | PURGED | |
| NASD | GS | 04/10/2006 | 05/25/2006 | APPROVED | 05/25/2006 |
| NY | AG | 04/10/2006 | 08/10/2006 | APPROVED | 08/10/2006 |

**EXHIBIT M**

**Marin, Marino**

| | |
|---|---|
| **From:** | Marin, Marino |
| **Sent:** | Wednesday, October 18, 2006 11:52 AM |
| **To:** | Lane, Fred |
| **Attachments:** | Doc8.doc |

Fred,

This is a document I would like to discuss with you while we read it together. Can you give me some time please? I want to get your view and help and understand if my focus is right.

# Memorandum

**To:**    Fred Lane

**From:**    Marino Marin

**Date:**    12/27/2006

**Re:**    Our conversation

---

Fred,

This is a document I would like to discuss with you while we read it together. Can you give me some time please? I want to get your view and help and understand if my focus is right.

On the basis of our conversation yesterday here are my thoughts on my vertical. Can this be applied to others? Probably yes. Can it be improved? Probably yes.

## Backgorund

In a new place that is typically how I start off to be productive from day one.

1. Leverage on my relationships (in our case Marina, HFH)
2. Leverage on proprietary ideas (Tesmec, Church, Superga et al)
3. Leverage on the firm relationships/hints  (Ais, Etonic et al)
4. Make the vertical work (produce a business plan and a calling program as we did for Steel and Waste)

The steps are not a sequence but are really in parallel. That is what I am doing here, but mainly focusing on the vertical. It does not mean however that I do not take care of the other 3 ways to make money. The objective is to create a vertical worth 10-15mm per year in revenues

## How I think I want my Vertical

The vertical should do 3 things with the objective of grow the Firm:

1. Make money
2. Create a franchise and enhance relationships for the vertical itself and the firm
3. Train people

1

*December 27, 2006*

It is tough to explain so I have prepared for you a graph.

In essence the Vertical (MD and other semi senior resources) should
   i.   feed and create ideas
   ii.   act upon it and be committed to it
   iii.   (with a) targeted and disciplined calling program.

In addition it should use the firm relationships and sector relationships to be opportunistic notwithstanding keeping alive the fundamental desktop research and the calling program.

The firm (other MDs that can create an opportunity) should be disciplined in involving all time the MD (never mind where is he /she based) in charge of the vertical: this is to avoid the "mom and pop" perception and to de-leverage the firm to move to the next opportunity.  This is all to get transactions done and cash in.

The role of the MD is to create and deliver without neglecting services to client but always focusing on new money making opportunity. Finally, the Vertical core team should train and involve junior resources to ensure continuation.

A final thought: the number of verticals should be limited in the firm. Perhaps new themes in the vertical can be added once the vertical upcoming bankers can support new idea and deal flow. The role of the MD in charge is at that point is to ensure support to that upcoming banker.

As far as the Industrials vertical, while completing and working on items 1, 2, and 3 in previous page, we have:
   • Built a review of the sector and thereafter a calling program for Waste services
   • Built a review of the sector and thereafter a calling program for specialty steel
   • About to create a calling program for specialty industrials (non automotive and borderline consumer)
   • Leveraged on resources such as David Clark, Jeff Gerson, Dan Fairwether and Kate Crespo (with the underlying idea of a vertical team) as well as Fred Lane and Steve Hines.

**2**

*December 27, 2006*



**EXHIBIT N**

## Marin, Marino

---

**From:**    Lane, Fred
**Sent:**    Thursday, October 19, 2006 6:08 PM
**To:**    Marin, Marino
**Subject:** A thoughtful (I hope) response to your email :-)

Marino,

- I read your email of 10/18/2006.

- You cover a lot of ground but...

- While you cover a lot of ground, let's be clear on priorities.

Here's how I see it:

- You have a lot of energy; contacts; creativity; ideas; commercial instincts.

- You are doing business, and you will do more business.

- Your primary goal, as you say, should be to generate (high quality) revenues. Efficiency and focus are the best tools for maximizing revenues.

- Efficiency is enhanced by focus and rules-based criteria:

    - Do we *want* the business? Size and fee potential.

    - Can we *get* the business? Usually, if it's a good engagement, we'll need to compete. Not always.

    - Can we *execute/complete the deal?* In this regard, sell-side business is better than buy-side, but it is also likely to require competing to get the mandate – see above.

    - Once we have the business, what is the most efficient role for Marino Marin? Frequently it will be to oversee, but focus primarily on the "next" opportunity. You need not worry about staying involved in a highly visible way if we can effectively "push down" execution; your highest value-added is creating business! In some cases and in the case of most larger deals, you will want to stay visibly involved and we will want that too. There is no "right" answer here.

- So, where should you be creating/seeking business?

    - Relationships of the past – easy to create; straightforward to qualify.

    - Consumer-related – like it or not, you are more focused here than elsewhere.

    - Industrials – here, we/you need a "map" leading to specific targets to guide activity.

- At least from today through year-end, focus narrowly on the above 3 areas and ignore title/head of *this* group or *that* group. The entire MD group will be better organized and focused soon, as will our overall calling focus.

- People want to work with you and see you as high value-added and high(er) potential!

- Helpful style observations:

12/27/2006

- Think through what you want to say and say it once effectively and strongly; people listen to you..

- Keep the message on point.

- Let others speak/make their points – internally and externally.

- Be patient and confident – it inspires confidence in others.

- Trust that your contributions are recognized – they are!

There is a saying that "life is what happens when we are not planning". While we both agree that planning is critical, for the short term this Firm needs "walk the walk" type leadership, which you are capable of providing. I believe you know that as well as anyone. Make sure that AIS is on track (let DC carry the ball with JK); try to get Marina Genova over the finish line; push the TSG initiatives; and continue to be the creative rainmaker that you are!



Fred

**Frederick C. Lane**
Chairman and CEO
**Lane, Berry & Co. International**
High Street Towers
125 High Street, Suite 2500
Boston, MA 02110
Phone:  (617) 624-7070, Fax:  (617) 742-0874
Email:  flane@laneberry.com
http://www.laneberry.com

12/27/2006

**EXHIBIT O**

**Marin, Marino**

| | |
|---|---|
| **From:** | Lane, Fred |
| **Sent:** | Thursday, December 14, 2006 6:53 PM |
| **To:** | Marin, Marino |
| **Subject:** | Re: |

Be patient. We are on your side, and I really do understand your point of view. We'll work out something.

On fees and compensation, the shorthand guideline is around 20 pct. Obviously higher fees, say more than 5 or 6 allow for that pct or more while 2 or 3 do not really allow for as much as 20 pct.

If on average each MD did 4 or 5, with total revenues at 40 million, the net payout to each MD would be on average close to 40 pct!!!

Fred
Frederick C. Lane
Chairman and Chief Executive Officer
Lane, Berry & Co. International, LLC
High Street Tower
125 High Street, Suite 2500
Boston, MA  02110
Phone: (617)-624-7070 Fax:  (617)-742-0874
email:  flane@laneberry.com
www.laneberry.com

----- Original Message -----
From: Marin, Marino
To: Lane, Fred
Sent: Thu Dec 14 18:26:48 2006
Subject:

Fred
Thank you for the time today. I would have call you but I am on the train. I look forward to have our conversation regarding the bonus as soon as convenient.
Also, just as a placeholder, I would like to understand exactly what it would mean to me if I close deals for  1,2,3,4,5 or more million.
Thank you

Marino Marin
Managing Director
Lane, Berry & Co. International, LLC
p: (212)-224 8545
f:  (212)-224 8501
m.(646) -241 6494

1

**EXHIBIT P**

| | |
|---|---|
| From: | Marin, Marino [mmarin@laneberry.com] |
| Sent: | Thursday, December 28, 2006 1:10 PM |
| To: | marinpersonal@yahoo.com |
| Subject: | Fw: Bonus Amount |

Marino Marin
Managing Director
Lane, Berry & Co. International, LLC
p: (212)-224 8545
f: (212)-224 8501
m.(646) -241 6494

----- Original Message -----
From: Albertelli, Christine
To: Marin, Marino
Cc: Lane, Fred
Sent: Thu Dec 28 12:45:48 2006
Subject: Bonus Amount

Due to a miscommunication your bonus was allocated and paid at $75,000.  Fred has requested an additional $25,000 be paid to you.  I will work with Sue to process the adjustment.

Christine Albertelli

Managing Director

Lane, Berry & Co. International, LLC

High Street Tower

125 High Street

Suite 2500

Boston, MA  02110

p: (617) 624-7060

f:  (617) 742-0876

calbertelli@laneberry.com <mailto:calbertelli@laneberry.com>

www.laneberry.com <http://www.laneberry.com/>

PLEASE NOTE: Address changes for NY and Boston offices

New York - Effective 9/22/06
280 Park Avenue
25th Floor West
New York, NY 10017

Boston - Effective 10/6/06

1

High Street Tower
125 High Street
Suite 2500
Boston, MA 02110

-----------------------------------------------------------------

The information contained in this e-mail message, and
any attachment thereto, is confidential and may not be
disclosed without our express permission. If you are
not the intended recipient or an employee or agent
responsible for delivering this message to the intended
recipient, you are hereby notified that you have received
this message in error and that any review, dissemination,
distribution or copying of this message, or any attachment
thereto, in whole or in part, is strictly prohibited. If you
have received this message in error, please immediately
notify us by telephone, fax or e-mail and delete the
message and all of its attachments. Thank you.

Every effort is made to keep our network free from viruses.
You should, however, review this e-mail message, as
well as any attachment thereto, for viruses. We take no
responsibility and have no liability for any computer virus
which may be transferred via this e-mail message.

**EXHIBIT Q**

**From:**    Marino Marin [marinpersonal@yahoo.com]
**Sent:**    Wednesday, February 21, 2007 9:25 PM
**To:**      eric stern; eric stern
**Subject:**  Fw Exhibit 23 : Meeting


----- Forwarded Message ----
From: "Lane, Fred" <flane@laneberry.com>
To: marinpersonal@yahoo.com
Cc: "Walsh, Tim" <twalsh@laneberry.com>; "Hines, Stephen" <shines@laneberry.com>; "Berry, Bob"
<bberry@laneberry.com>; "Albertelli, Christine" <calbertelli@laneberry.com>
Sent: Monday, February 19, 2007 12:27:43 PM
Subject: Meeting

Marino,

It appears that you have made your decision and had made that decision and communicated it by your actions to
all in NY prior to our talking on Friday.

We need to talk about how to satisfy our obligations to clients where there are engagement letters.

Fred

**Frederick C. Lane**

Chairman and Chief Executive Officer

**Lane, Berry & Co. International, LLC**

High Street Tower

125 High Street, Suite 2500

Boston, MA 02110

Phone: (617) 624-7070 | Fax:  (617) 742-0874

email:  flane@laneberry.com

www.laneberry.com


------------------------------------------------------------
The information contained in this e-mail message, and
any attachment thereto, is confidential and may not be
disclosed without our express permission. If you are
not the intended recipient or an employee or agent
responsible for delivering this message to the intended

recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution or copying of this message, or any attachment thereto, in whole or in part, is strictly prohibited. If you have received this message in error, please immediately notify us by telephone, fax or e-mail and delete the message and all of its attachments. Thank you.

Every effort is made to keep our network free from viruses. You should, however, review this e-mail message, as well as any attachment thereto, for viruses. We take no responsibility and have no liability for any computer virus which may be transferred via this e-mail message.

Food fight? Enjoy some healthy debate
in the Yahoo! Answers Food & Drink Q&A.

2/22/2007

**EXHIBIT R**

**From:** BosBear@aol.com [mailto:BosBear@aol.com]
**Sent:** Tuesday, October 09, 2007 7:40 PM
**To:** Marino Marin
**Subject:** Re: follow up

LB got the deal of the bet of both of us.  You landed the deal and pulled the wagon.  I did the heavy lifting.  hmmmm....screwed up world.

See what's new at AOL.com and Make AOL Your Homepage.

This e-mail transmission contains confidential information that is intended only for the individuals or entities named on this e-mail. If the reader of this e-mail is not the intended recipient or an employee or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this e-mail in error. Any distribution, copying, or taking or any action based on or in reliance on the contents of this message is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone or e-mail and delete the original message. Thank you.

All securities transactions are conducted through Gruppo, Levey and Co. member of NASD, SIPC.

**From:** BosBear@aol.com [mailto:BosBear@aol.com]
**Sent:** Tuesday, October 09, 2007 7:24 PM
**To:** Marino Marin
**Subject:** follow up

Let me give you some color.

In my conversations with you, you indicated that you had an arrangement with AUDAX to compensate you somewhere between $250,000 and ???? based on the AIS deal closing. I thought that was great and as I had discussed with you more often than once very appropriate as you were the reason that we ultimately retained Lane Berry to provide us with Investment Banking services. Those services were retained at a premium to another firm that candidly we felt was every bit as qualified. We thought when we stacked up the standard PRO and CON chart you were the clear difference maker and were excited to hire Lane Berry because we got you.

Ultimately you defected from Fred and worked with AUDAX to assist with the transaction. You were invaluable in the process and were I'm sure, an important cog in the Audax arsenal to help position them to get the transaction closed.

Last week I was called from my AUDAX team members and they asked my thoughts regarding your compensation. They were unaware that I had conversations with you on this topic. I did not share that information  They told me they thought the payment agreement was between $100,000 and $250,000. I was surprised but figured you had made the mistake. Regardless I thought about it long and hard and determined that absent the agreement, how should you be compensated for your efforts in this transaction post your involvement with Lane Berry. I felt $250,000 was fair and reasonable and relayed that to AUDAX. Ironically we will pay Lane Berry almost 1.1 million dollars here, you are probably entitled to a good piece of that fee and that is who should be paying it.

I trust you won't find my position as unfair or disingenuous in any way. I think the world of you and the way you go about your business. I consider you an ally and hope you consider me the same.

We will talk post transaction, I am sure.

Arthur

---

See what's new at AOL.com and Make AOL Your Homepage.

*"Sternberg, Peter" <psternberg@orrick.com>* wrote:
Subject: FW: Wollars/Lane Berry
Date: Fri, 18 May 2007 17:26:48 -0400
From: "Sternberg, Peter" <psternberg@orrick.com>
To: "Marino Marin" <marinpersonal@yahoo.com>

**From:** Kiernan, Vincent [mailto:VKiernan@eapdlaw.com]
**Sent:** Friday, May 18, 2007 5:17 PM
**To:** Sternberg, Peter
**Subject:** RE: Wollars/Lane Berry

Peter,

I forwarded your proposal to Lane Berry and have the following counterproposal from them. We have converted payment percentages into cash to make sure there is no misunderstanding.

1. Payments to Lane Berry of:
   (a) $87K payable on execution of a settlement agreement (amount includes $12K for expenses).

   (b) $75K payable on the earlier of August 21, 2007 or the closing of a Sale Transaction.

   (c) If, prior to November 21, 2007, a Sale Transaction closes with any party or an agreement is entered into with any party prior to November 21, 2007 which closes after that date, $220K plus an additional $80K if the Aggregate Consideration is greater than Euro 45 million, less the amount of the payments already made pursuant to paragraphs (a) and (b) above (not including the $12K paid for expenses), all such amounts payable in full on closing.

4. Reaffirmation of the indemnification obligations under the engagement letter.

5. Mutual releases of any claims or potential claims between the parties other than the terms of the settlement.

The capitalized terms used above have the meanings attributed to them under the engagement letter between our respective clients.

This offer is also without prejudice and will remain open until May 22, 2007.

Vinny

**From:** Sternberg, Peter [mailto:psternberg@orrick.com]
**Sent:** Friday, May 18, 2007 11:24 AM
**To:** Kiernan, Vincent
**Subject:** RE: Wollars/Lane Berry

Vinnie,

The process remains at preliminary stage and there is no agreement in place to sell the business.

Peter

---

**From:** Kiernan, Vincent [mailto:VKiernan@eapdlaw.com]
**Sent:** Friday, May 18, 2007 11:01 AM
**To:** Sternberg, Peter
**Subject:** RE: Wollars/Lane Berry

Peter,

I forwarded your proposal to Lane Berry and should be able to get back to you soon with their response.  Before we respond, has an agreement has been reached to sell the business?

As you would expect, the answer will influence how we respond to your proposal.

Vinny

---

**From:** Sternberg, Peter [mailto:psternberg@orrick.com]
**Sent:** Thursday, May 17, 2007 12:01 PM
**To:** Kiernan, Vincent
**Subject:** Wollars/Lane Berry

Vinnie,

We can agree to a 20% Transaction Fee altogether, payable:

a)  $75K upon finalizing a settlement,
b)  $75K on the sooner to occur of August 21, 2007 or a closing, and
c)  the balance upon closing but such balance payable only if closing takes place prior to (ii) August 21, 2007 with any purchaser, or (b) February 21, 2008 with any purchaser other than one of the "Exhibit A" entities.

The offer above is without prejudice and remains open until May 22, 2007.

Peter

PETER STERNBERG

---

**From:** Kiernan, Vincent [mailto:VKiernan@eapdlaw.com]
**Sent:** Tuesday, May 15, 2007 3:57 PM

**To:** Sternberg, Peter
**Subject:** Wollars

Peter,

I spoke with my client regarding our conversation last Friday. I have been authorized to make the following proposal in an attempt to find a middle ground to settle what is and would be owed Lane Berry under the terms of the engagement letter between them and Wollars Holdings S.A.

The settlement we propose is composed of 4 parts:

1. Simultaneously with signing a settlement agreement, your client will pay $150,000 to Lane Berry in satisfaction of the Financial Advisory Fee and any disbursements incurred pursuant to this engagement.

2. If, prior to February 21, 2008, a Sales Transaction occurs or an agreement is entered into which subsequently results in a Sales Transaction, my client will be paid at closing either $250,000 if the Aggregate Consideration is equal to or less than Euro 45 million or $350,000 if the Aggregate Consideration is greater than Euro 45 million.

3. Reaffirmation of the indemnification obligations under the engagement letter.

4. Mutual releases of any claims or potential claims between the parties other than the terms of the settlement.

The executed settlement agreement would be held in escrow pending receipt of the $150,000 payment from Wollars.

This offer is good until this Friday at 5 pm at which time it is withdrawn if not accepted before then. If withdrawn, my client will look to enforce all of its rights under the engagement letter.

Please let me know whether your client accepts this offer.

Vinny


**Vincent M. Kiernan**
Edwards Angell Palmer & Dodge, LLP
301 Tresser Blvd.
Stamford, CT 06901

Direct Phone:     (203) 353-6801
Direct Fax:        (888) 325-9572

email: vkiernan@eapdlaw.com
Website: www.eapdlaw.com


Boston, Ft. Lauderdale, Hartford, New York, Providence, Short Hills, Stamford, West Palm Beach, Wilmington, London (Representative office)

Disclosure Under IRS Circular 230: Edwards Angell Palmer & Dodge LLP informs you that any tax advice contained in this communication, including any attachments, was not intended or written to be used, and cannot be used, for the purpose of avoiding federal tax related penalties or promoting, marketing or recommending to another party any transaction or matter addressed herein.

CONFIDENTIALITY NOTICE
This e-mail message from Edwards Angell Palmer & Dodge LLP is intended only for the individual or entity to which it is addressed. This e-mail may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not

the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you received this e-mail by accident, please notify the sender immediately and destroy this e-mail and all copies of it.

================================================================

IRS Circular 230 disclosure:
To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice contained in this communication, unless expressly stated otherwise, was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any tax-related matter(s) addressed herein.

================================================================

NOTICE TO RECIPIENT: THIS E-MAIL IS MEANT FOR ONLY THE INTENDED RECIPIENT OF THE TRANSMISSION, AND MAY BE A COMMUNICATION PRIVILEGED BY LAW. IF YOU RECEIVED THIS E-MAIL IN ERROR, ANY REVIEW, USE, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS E-MAIL IS STRICTLY PROHIBITED. PLEASE NOTIFY US IMMEDIATELY OF THE ERROR BY RETURN E-MAIL AND PLEASE DELETE THIS MESSAGE FROM YOUR SYSTEM. THANK YOU IN ADVANCE FOR YOUR COOPERATION.
For more information about Orrick, please visit http://www.orrick.com/
================================================================

Marino Marin
+1 917 576 8238

Tonight's top picks. What will you watch tonight? Preview the hottest shows on Yahoo! TV.

-----Original Message-----
From: Lane, Fred <flane@laneberry.com>
To: Stefano Bonfiglio
CC: Berry, Bob <bberry@laneberry.com>; Albertelli, Christine <calbertelli@laneberry.com>
Sent: Sat Mar 24 21:05:57 2007
Subject: Re: Status of Tesmec

Stefano,

Thanks for getiing back to me so promptly.

Just to clarify the situation, my  inquiry related to the receipt of a fee by Lane Berry, not by Fred
Lane.

Marino Marin worked for the firm for 10 months and represented to all of us here numerous times
that there was an agreement that Stirling Square would pay $1 million, as a finder, to Lane Berry
on the Tesmac deal. Marino's decision to leave the firm doesn't change the situation. That fee
should certainly be payable to Lane Berry and not to Marino Marin. In fact, Marino's receipt of
such a fee would be blatantly inappropriate
as well as illegal under common law.

I will follow up on the matter with your partner, Mr. Napoleone.

All the best,
Fred


Frederick C. Lane
Chairman and Chief Executive Officer
Lane, Berry & Co. International, LLC
High Street Tower
125 High Street, Suite 2500
Boston, MA  02110
Phone: (617)-624-7070 Fax:  (617)-742-0874
email:  flane@laneberry.com
www.laneberry.com

----- Original Message -----
From: Stefano Bonfiglio <SB@stirlingsquare.com>
To: Lane, Fred
Sent: Sat Mar 24 15:27:52 2007
Subject: RE: Status of Tesmec

Dear Fred, good to hear from you!  Unfortunately I was not involved in the transaction and I a not
aware of any progress made on it.  As concerns a possible fee due to Fred Lane in the event of a
successful transaction, my partner Gregorio Napoleone tells me that no agreement had been
reached yet with Marino before his departure (which I was not aware of until your e-mail).  I am
not sure how to progress at this juncture, but it looks like you should discuss it with Marino
directly. Please let me know how you have solved the situation with Marino and how we should
proceed accordingly.

Best wishes,

Stefano

---

Stefano Bonfiglio

Stirling Square Capital Partners

Liscartan House

127-131 Sloane Street

London  SW1X  9AS


+ 44 (0) 20 7808 4130 (Switchboard)

+ 44 (0) 20 7808 4150 (Direct)

+ 44 (0) 20 7808 4131 (Facsimile)

+ 44 (0) 7771 898 045 (Mobile)

sb@stirlingsquare.com <mailto:sb@stirlingsquare.com>

---

From: Lane, Fred [mailto:flane@laneberry.com]
Sent: 23 March 2007 12:48
To: Stefano Bonfiglio
Cc: Albertelli, Christine; Berry, Bob
Subject: Status of Tesmec


Stefano,

I have been intending for some time to reach out to you and check up on the status of Stirling Square's negotiations to acquire Tesmec. With Marino Marin's recent decision to resign from Lane Berry, I should be the contact point for you as the deal progresses.

While we had understood from Marino that your express desire is to pay us a finder's fee and not have us play any active role in the deal process, we certainly would be pleased to serve as a resource to you. We are always prepared to do some real work to receive a $1 million fee.

Our DLJ alumni club (Tony, Ken, and others) are certainly distinguishing themselves, don't you agree?

All the best,

Fred

Frederick C. Lane

Chairman and Chief Executive Officer

Lane, Berry & Co. International, LLC

High Street Tower

125 High Street, Suite 2500

Boston, MA 02110

Phone: (617) 624-7070 | Fax:  (617) 742-0874

email:  flane@laneberry.com <mailto:flane@laneberry.com>

www.laneberry.com <http://www.laneberry.com>

--------------------------------------------------------------
The information contained in this e-mail message, and
any attachment thereto, is confidential and may not be
disclosed without our express permission. If you are
not the intended recipient or an employee or agent
responsible for delivering this message to the intended
recipient, you are hereby notified that you have received
this message in error and that any review, dissemination,
distribution or copying of this message, or any attachment
thereto, in whole or in part, is strictly prohibited. If you
have received this message in error, please immediately
notify us by telephone, fax or e-mail and delete the
message and all of its attachments. Thank you.

Every effort is made to keep our network free from viruses.
You should, however, review this e-mail message, as
well as any attachment thereto, for viruses. We take no
responsibility and have no liability for any computer virus
which may be transferred via this e-mail message.

This email has been scanned by the MessageLabs Email Security System. For more information
please visit http://www.messagelabs.com/email

--------------------------------------------------------------
The information contained in this e-mail message, and
any attachment thereto, is confidential and may not be
disclosed without our express permission. If you are
not the intended recipient or an employee or agent
responsible for delivering this message to the intended
recipient, you are hereby notified that you have received
this message in error and that any review, dissemination,
distribution or copying of this message, or any attachment
thereto, in whole or in part, is strictly prohibited. If you

have received this message in error, please immediately notify us by telephone, fax or e-mail and delete the message and all of its attachments. Thank you.

Every effort is made to keep our network free from viruses. You should, however, review this e-mail message, as well as any attachment thereto, for viruses. We take no responsibility and have no liability for any computer virus which may be transferred via this e-mail message.

This email has been scanned by the MessageLabs Email Security System. For more information please visit http://www.messagelabs.com/email

This e-mail transmission contains confidential information that is intended only for the individuals or entities named on this e-mail. If the reader of this e-mail is not the intended recipient or an employee or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this e-mail in error. Any distribution, copying, or taking or any action based on or in reliance on the contents of this message is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone or e-mail and delete the original message. Thank you.

All securities transactions are conducted through Gruppo, Levey and Co. member of NASD, SIPC.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Civ. No. _____ (____)

---

**MARINO MARIN,**

Plaintiff,

- against -

**LANE BERRY & CO. INTERNATIONAL, LLC, AND FREDRICK C. LANE**

Defendants.

---

**COMPLAINT**

---

**SACK & SACK, ESQS.**

**ATTORNEYS FOR PLAINTIFF**

110 East 59th Street, 19th Floor
New York, New York 10022
Tel.: (212) 702-9000
Fax: (212) 702-9702